UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HPS MECHANICAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> JMR CONSTRUCTION CORP., et al., <br><br> Defendants. | Case No.  11-cv-02600-JCS <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ..................................................................................... 2
II.  FINDINGS OF FACT ............................................................................. 3
     A. Overview of the Project ................................................................. 3
     B. Project Deadlines .......................................................................... 4
     C. Course of the Project .................................................................... 6
          i.   June 2008 − August 2008 ..................................................... 6
          ii.  September 2008 − March 2009 ............................................. 10
          iii. March 2009 − October 2009 ................................................ 13
          iv.  October 2009 − March 2010 ............................................... 15
          v.   March 2010 − August 2010 ................................................ 16
     D. JMR's Request for Equitable Adjustment ................................... 16
     E. Overview of the Parties' Claims .................................................. 18
III. CONCLUSIONS OF LAW ................................................................... 19
     A. The Miller Act ............................................................................. 19
     B. Section 8.4 of the Subcontract .................................................... 22
     C. HPS's Claims ............................................................................... 25
          i.    Delay Claim (PCO 23) ...................................................... 25
          ii.   Valves out of Sequence (PCO 7) ...................................... 32
          iii.  Acceleration (PCO 9) ........................................................ 33
          iv.   Directional Drilling (PCO 24) ......................................... 34
          v.    Installation of Steel Offsets at Chanterella (PCO 44) .......... 36
          vi.   Reinstallation of Steel Offset at Chanterella (PCO 51) .......... 38
          vii.  Installation of Test Plate (PCO 53) ................................. 38
          viii. Total HPS Claims Recoverable (Before Offset) .................. 39

United States District Court<br>Northern District of California

D.  JMR's Claims ........................................................................................ 39
    i.   Delay Claim ......................................................................... 39
    ii.   Backcharge No. 1 ................................................................ 48
    iii.  Backcharge No. 2 ................................................................ 55
IV. CONCLUSION ........................................................................................ 59

## I.      INTRODUCTION

1.      The disputes in this case arose during the construction of the San Ramon Valley Recycled Water Project − Pump Station R200A and Pipeline, located in the City of San Ramon, California (hereafter, "the Project").

2.      The owner of the Project was the United States Army Corps of Engineers ("USACE").

3.      JMR Construction Corp. ("JMR") submitted a bid to the USACE on April 14, 2008.  Morrill Expert Report, Exh. 291 at 3.  The USACE awarded the Prime Contract to JMR on April 30, 2008 in Contract No. WP912P-08-C-0004.  *See id.*; Exh. 329 (Prime Contract).

4.      JMR awarded HPS Mechanical, Inc. ("HPS") a Subcontract Agreement for the Project (hereafter, "the Subcontract").  *See* Subcontract, Exh. 328.

5.      Pursuant to the Miller Act, 40 U.S.C. § 3131, JMR was required to furnish a "payment bond with a surety … for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person."  40 U.S.C. § 3131(b)(2).  JMR obtained a payment bond with a surety, Great American Insurance Company ("GAIC"), which made GAIC liable to "[e]very person that has furnished labor or material in carrying out work provided for" the Project "and that has not been paid…."  40 U.S.C. § 3133(b)(1).

6.      On June 1, 2011, HPS filed this action against JMR and GAIC (collectively, "Defendants").  Dkt. No. 1.  HPS asserts claims under the Miller Act, 40 U.S.C. § 3133(b)(1), and for breach of contract.  On September 9, 2011, JMR filed a counterclaim against HPS for breach of contract.  Dkt. No. 13.

7.      On November 6, 2013, the Court denied Defendants' motion for partial summary judgment.  *See HPS Mech., Inc v. JMR Constr. Corp.*, No. 11-cv-02600-JCS, Dkt. No. 111, 2013

2

United States District Court
Northern District of California

1    WL 5954895 (N.D. Cal. Nov. 6, 2013).  A bench trial for this case was held on the 19th, 20th,

2    24th and 25th of February of 2014.  Dkt. Nos. 139-44.  The parties submitted post trial briefing on

3    the 11th and 28th of April of 2014, along with proposed findings of fact and conclusions of law.

4    Dkt. Nos. 150-55.  Given the extensive nature of this briefing, the Court finds that final oral

5    argument is not necessary.

6         8.      After considering and weighing all the evidence and the parties' arguments, and

7    having assessed the credibility of the witnesses, the Court enters the following findings of fact and

8    conclusions of law as required by Federal Rule of Civil Procedure 52(a).

9                          **II.      FINDINGS OF FACT**

10   **A.     Overview of the Project**

11        9.      The Project involved two components.  The first component entailed the

12   installation of a pipeline in one traffic lane of Bollinger Canyon Road in the City of San Ramon

13   (hereafter, "the Pipeline").  Testimony of John Morrill ("Morrill"), Tr. 474.  The second

14   component of the Project entailed the construction of a pump station to allow the system to stay

15   pressurized (hereafter, "the Pump Station").  *Id*. at 475.

16        10.     The Pipeline component of the Project required installation of approximately 6,558

17   feet of a 16-inch mainline.  Morrill Expert Report, Exh. 291 at 5.  Eight-inch branch laterals were

18   to be connected to the 16-inch mainline by special butterfly valves at three intersections along

19   Bollinger Canyon Road.  Morrill, Tr. 476-77; Testimony of Jack Sloss ("Sloss"), Tr. 31.

20        11.     HPS submitted a bid to conduct certain work on the Project on April 10, 2008.  *See*

21   HPS Bid, Exh. 212.  HPS and JMR entered into a Subcontract on June 16, 2008.  *See* Subcontract,

22   Exh. 328 at 34.  Under the Subcontract, HPS was required to do most of the work for the Pipeline

23   portion of the Project.  HPS expert John Irwin describes HPS's scope of work for the Pipeline as

24   follows:

25              HPS had to trench the street, then transport each fused section and
              drop it into the pipe trench.  HPS then connected sections together
26              with couplings, installed 16-inch butterfly valves where required
              along the line, installed air release piping and valves, installed blow
27              off piping, and installed the laterals.

28   Irwin Expert Report, Exh. 623 at 8; *see also* Subcontract, Exh. A (Subcontractor's Scope of

United States District Court
Northern District of California

1   Work).   HPS was also responsible for "backfill" of the trench, which required HPS to fill and

2   compact aggregate base in the trench up to about six inches below asphalt paving.  Testimony of

3   Gareth Figgness ("Figgness"), Tr. 595.

4        12.     The Subcontract also required HPS to do some work on the Pump Station.  John

5   Irwin describes HPS's scope of work for the Pump Station as follows:

6            HPS's scope of work at the Pump Station included piping within the
             Pump Station and underground piping outside the Pump Station to
7            the existing 16-inch DERWA pipe in Iron Horse Trail.  HPS did not
             provide or install any of the mechanical equipment inside the Pump
8            Station − pumps, air compressor, surge tank and HVAC equipment.
             HPS only was required to connect piping to equipment.
9

10  Irwin Expert Report, Exh. 623 at 8.

11  **B.      Project Deadlines**

12       13.     The contract performance period was 365 days from the day the USACE issued

13  JMR the Notice to Proceed, which occurred on May 16, 2008.  Prime Contract, Exh. 329 at 21.

14  Therefore, May 16, 2009 was the deadline for completion of the entire Project.  Morrill, Tr. 472.

15       14.     In addition, August 22, 2008 was a milestone deadline for the installation of the

16  Pipeline portion of the Project.  The following provision is included in the Scope of Work of the

17  Subcontract:

18            The pipeline portion of the project shall begin no sooner than May 1,
             2008 and be completed before August 22, 2008 (before school
19            begins).  Once work on the pipeline begins it shall be continuous
             and uninterrupted, the work on the pipeline shall not remain dormant
20            once begun.

21  Exh. 328 at 31.  Section 3.4 of the Subcontract incorporates the specifications for the Project and

22  the Prime Contract, which also require complete installation of the Pipeline by August 22, 2008.

23  Subcontract, Exh. 328 at 5 (Art. III, § 3.4); Prime Contract, Exh. 329 at 21, Specifications, Exh.

24  278 at 196.

25       15.     This August 22, 2008 deadline for complete installation of the Pipeline was noted

26  in Section 3.3.2 of the Project specifications.  Exh. 278 at 196.  When HPS submitted its bid to

27  JMR on April 10, 2008, HPS was aware of the August 22, 2008 deadline.  Testimony of Kenneth

28  Pourroy ("Pourroy"), Tr. 316.

4

United States District Court
Northern District of California

16.     The August 22, 2008 deadline was put in place because the City of San Ramon (hereafter, "City") was concerned that installation after school began would cause undue traffic congestion on Bollinger Canyon Road, a main thoroughfare.  Testimony of Theresa Peterson ("Peterson"), Tr. 218.  The encroachment permit issued by the City for the installation of the Pipeline expired on August 22, 2008.  Encroachment Permit, Exh. 404 at 43.  An encroachment permit was necessary for any work to encroach upon the City's property.  Peterson, Tr. 218.

17.     HPS contends that August 22, 2008 was only a deadline to install the mainline portion of the Pipeline, and not the laterals and valves.  However, the evidence supports the Court's conclusion that August 22, 2008 was the deadline to complete full installation of the Pipeline, including the 16-inch mainline, the 8-inch laterals, and the specialty butterfly valves. Testimony of Eileen Nixdorf ("Nixdorf"), Tr. 117-18; Peterson, Tr. 216; Testimony of Roy Shields ("Shields"), Tr. 252; Morrill, Tr. 484, Figgness, Tr. 570; Testimony of Ron Rivard ("Rivard"), Tr. 606.

18.     HPS's evidence to the contrary is unpersuasive.  HPS notes that by June 11, 2008, the City had only approved a traffic control plan for installation of the mainline, and planned to create a traffic plan for the laterals and valves at a later date.  Meeting Notes, Exh. 695; Shields, Tr. 257.  However, JMR presented testimony that it only takes one day to approve a traffic control plan.  Rivard, Tr. 610.  Thus, the fact the traffic control plan was not complete did not have a material impact on the August 22, 2008 deadline.

19.     Moreover, the contemporaneous evidence shows that the traffic control plan was not complete for the installation for the laterals and valves because JMR, HPS and the City sought to redesign the location of the valves away from the intersections.  *See* Meeting Notes, Exh. 695. Contrary to HPS's contention, the fact the traffic control plan was incomplete in June 2008 does not say anything about what HPS was required to install by August 22, 2008.

20.     HPS also contends that JMR prepared a baseline schedule on May 19, 2008, which indicated that the intersection work on the Pipeline would take place in the evenings beginning on August 18, 2008, and continue through September 16, 2008.  *See* Irwin, Tr. 368-69; Exh. 442 (May 19, 2008 project schedule).  This schedule depicted in Exhibit 442 indicates that Pipeline

United States District Court
Northern District of California

1    construction would be complete on September 19, 2008, that only the mainline portion of the

2    pipeline would be complete by August 21, 2008, and that work on the valves and laterals would

3    take place at night after August 22, 2008.  Exh. 442 at 12; Irwin, Tr. at 368-70.

4        21.    However, evidence of record shows that this "baseline schedule"[1] was created in

5    reaction to information that the butterfly valves would not be delivered in time to connect the 8-

6    inch laterals to the 16-inch mainline.  *See* JMR's REA, Exh. 523 at 6 ("the delivery of the needed

7    valves for interconnecting the lateral ties at the roadway intersections could not be delivered for

8    full completion of all pipeline work by August 22, 2008.  *Therefore*, completion of this remaining

9    portion of the lateral pipeline work was to be performed during a night shift operation upon

10   delivery of the valves to the site.") (emphasis added).  As discussed below, the delayed delivery of

11   the valves was the responsibility of HPS.

12       22.    Pursuant to section 3.8 of the Subcontract, "[n]o modification of [the Subcontract]

13   shall be binding unless the same is in writing signed by the Contractor and the Subcontractor."

14   Subcontract, Exh. 328 at 6.  HPS has not presented evidence of any change order or any other

15   writing signed by JMR relieving HPS of its obligation to install the laterals and valves by August

16   22, 2008.  The "baseline schedule" proffered by HPS does not relieve HPS of its contractual

17   obligations.  Accordingly, the Court finds that HPS was at all times required to complete the

18   Pipeline portion of the Project, including the valves and laterals, by August 22, 2008.

19   **C.    Course of the Project**

20        **i.    June 2008 − August 2008**

21       23.    HPS started physical construction on the Project between June 16 and 19, 2008.

22   Morrill, Tr. 472; Irwin Expert Report, Exh. 623 at 24.

23

24       [1] Both parties have presented evidence that the schedule created in May of 2008 was not
25   the actual baseline schedule for the Project, which was not submitted to the USACE until July 15,
     2008.  Irwin Expert Report, Exh. 623 at 26 ("the Baseline Schedule … was not submitted until
26   7.15.2008."); Elmer Tr. at 662; *see also* JMR REA, Exh. 523, Exh. 1.2.1 (Baseline Schedule).
     The only schedule complete by May 2008 was the "Preliminary Project Schedule Submission,"
27   which was required to be complete within 20 days of the Notice to Proceed by section 3.4.1 of
     Specification 01320-6.  *See* Exh. 278 at 246.
28

24.     HPS did not complete installation of the Pipeline by the milestone deadline of August 22, 2008.

25.     As discussed below, there are several reasons why HPS did not complete installation of the Pipeline by the August 22, 2008 milestone deadline.  The most important factor was the delayed delivery of the butterfly valves that would connect the 8-inch laterals to the 16-inch mainline of the Pipeline.  Other factors include: 1) the initial delay in starting work; 2) HPS encountering several obstructions in the path of the Pipeline; 3) HPS's forty-seven failed compaction tests; and, 4) a two-day Safety Stand-Down in which all work was stopped.

### *Delayed Delivery of the Valves*

26.     The butterfly valves required for the Pipeline were unusual because they opened clockwise instead of counterclockwise.  Testimony of Les DenHerder ("DenHerder"), Tr. 428-29; Morrill, Tr. 558; Exhs. 424, 441.

27.     To supply the valves, HPS subcontracted with a supplier, R&B Company ("R&B").  Testimony of Kurt Vincellete ("Vincellete"), Tr. 120.  R&B sourced the valves from the manufacturer, Henry Pratt Company.  Pourroy, Tr. 123.  On March 22, 2008, Henry Pratt Company informed R&B that the valves had a 10 to 14 week lead time after receipt of order.  Exh. 738.

28.     Prior to the time in which HPS submitted its bid to the USACE, R&B did not inform HPS that the valves had a 10 to 14 week lead time after receipt of order.  Pourroy, Tr. 316.  HPS was not informed of the long lead time until the USACE approved the submittals for the valves on July 25, 2008.  *Id*. at 324; Vincellete, Tr. 124-25; Exh. 731.

29.     At trial, Kenneth Pourroy testified that HPS did not determine whether the valves had a long lead time prior to submitting its bid because its "normal protocol is to rely on [its] suppliers" to determine the lead time.  Pourroy, Tr. 316.  R&B states that it did not inform HPS of the long lead time because R&B "did not have a general practice of providing that information until" it receives a "firm lead time" from the manufacturer, which it does not receive until the USACE approves the submittals.  Vincellete, Tr. 124-25, 129.

30.     An order for the valves was submitted to Henry Pratt Company on or around July

United States District Court
Northern District of California

25, 2014, commencing the 10 to 14 week lead time.  Notably, the "firm lead time" provided on July 25, 2008 after the USACE approved the submittals is the same 10 to 14 week lead time provided to R&B on March 22, 2008.  *See* Exhs. 731, 738.

31.     In addition to the 10 to 14 week lead time, the manufacturing of the valves was further delayed because worm gear for the valves required in the specifications needed to be outsourced.  Vincellete, Tr. 131.  For these reasons, the valves did not arrive in California until the first shipment arrived on October 28, 2008, and the second shipment arrived on November 3, 2008.  Irwin, Tr. 370.

*Other Factors Causing Delay*

32.     There was an initial delay in both procuring the valves and in the start of construction on the Pipeline.  The contract documents state that construction on the Pipeline could begin on or after May 1, 2008.  Subcontract, Exh. 328 at 31.  USACE awarded JMR the Prime Contract on April 30, 2008, and issued the Notice to Proceed on May 16, 2008.  Irwin Expert Report, Exh. 623 at 24.  HPS received the Subcontract from JMR on June 3, 2008, though it had received letter of intent to contract from JMR on May 9, 2008 that had requested HPS to "forward a complete submittal package" by May 16, 2008.  Exh. 675 (Letter of Intent to Contract); Morrill Expert Report, Exh. 291 at 3.

33.     HPS did not begin the process of procuring the valves until June 8, 2008, after HPS received the Subcontract on June 3, 2008.  Irwin Expert Report, Exh. 623 at 24.  On June 13, 2008, JMR received the Subcontract from HPS, which it signed on June 16, 2008.  Subcontract, Exh. 328 at 34; Dkt. No. 152, ¶ 17.  JMR obtained an encroachment permit from the City on June 9, 2008.  Encroachment Permit, Exh. 404.  HPS began construction between June 16 and 19, 2008.  Morrill, Tr. 472; Irwin Expert Report, Exh. 623 at 24.

34.     Once HPS actual began construction, HPS was delayed when it encountered a total of eleven obstructions in the path of the Pipeline.  *See* Sloss, Tr. 11-13; Irwin Expert Report, Exh. 623 at 24-25.  HPS claimed that these obstructions caused approximately five days of delay.  *See* Morrill Expert Report, Exh. 291 at 6.

35.     HPS was also delayed when it failed forty-seven compaction tests.  Figgness, Tr.

8

United States District Court
Northern District of California

578; Morrill Expert Report, Exh. 291 at 6; Irwin, Tr. 355; Irwin Expert Report, Exh. 623 at 25 ("HPS had some issues in early July in not achieving appropriate compaction of the trench backfill."). This also caused approximately five days of delay. *See id.*

36.     There was a two-day delay for a "Safety Stand-Down" called by JMR's superintendant on the Project, John Morrill, "in response to unsafe conditions involving HPS activity in a trench that contained unidentified electrical lines." Morrill Expert Report, Exh. 291 at 6. Morrill excerpts correspondence between JMR and HPS regarding this issue in his expert report:

> HPS was notified on numerous occasions of unsafe work habits, and consistently performed excavation for the 16" pipeline without prior potholing. A meeting with HPS' site superintendant occurred during this stand-down time period to discuss safety, and project coordination requirements in an effort to remedy the problems.

*Id.* Testimony at trial revealed that HPS employees had run over and removed traffic control, not worn hard hats, and unsafely excavated around the Kinder Morgan Pipeline. *See* Bewley, Tr. 145-46; Peterson, Tr. 238-41; Morrill, Tr. 491; Figgness, Tr. 579.

37.     Prior to August of 2008, HPS only had one crew working on the Pipeline. Shields, Tr. 274-75. Starting in late July and August 2008, JMR directed HPS's crew to work overtime on nights and weekends. Sloss, Tr. 26; Pourroy, Tr. 323; Morrill, Tr. 509; Exhs. 593, 864. At this time, HPS increased its crew from about 9 workers to 13. Irwin Expert Report, Exh. 623 at 26.

*Directional Drilling*

38.     The contract documents gave HPS the option to install the Pipeline in the intersections by one of two methods: 1) direct drilling, or 2) open cut. "Directional drilling" means boring a hole. "Open cut" means digging a trench and laying the pipe. Bewley, Tr. 140; Pourroy, Tr. 198, 303-04, 308-09; DenHerder, Tr. 425-26; Rivard, Tr. 453-54; Exhs. 419, 440.

39.     In an attempt to finish installation of the mainline of the Pipeline prior to the August 22, 2008 deadline, "HPS along with the concurrence of JMR engaged a subcontractor Wellco to install the pipe through the three intersections using directional drilling." Irwin Expert Report, Exh. 623 at 25-26.

40.     There is a factual dispute as to whether JMR *required* HPS to use the directional

9

1   drilling method through the intersections, or if HPS decided to directionally drill on its own

2   initiative.  Sloss, Tr. 21; Pourroy, Tr. 196-99; Exh. 711.  An email shows that JMR gave HPS the

3   option to hire and pay for a directional driller, or have a deductive back charge be issued reducing

4   the amount of their Subcontract amount.  Exh. 711.  One can infer from this email that JMR did

5   not give HPS any other option but to use the directional drilling method, and pay for it.  *See id.*

6        41.    JMR has presented evidence which shows that HPS may have intended to use the

7   directional drilling method at the time HPS submitted its bid to JMR.  Morrill testified that HPS

8   excluded 2,580 cubic yards from its bid for JMR to cover the cost of that haul off, but that if HPS

9   had planned to use the open cut method in the intersections, HPS would have estimated twice that

10  amount of dirt to be hauled off.  Morrill, Tr. 515.  Morrill also testified that HPS would have

11  needed a shoring plan to use the open cut method on the intersections, and that HPS had not

12  submitted a shoring plan at any point prior to telling JMR they were going to directionally drill.

13  *Id*.

14       42.    JMR does not dispute that HPS actually began to use the open cut method on the

15  first intersection they approached, but was prevented by JMR from continuing with the open cut

16  method.  *See* Sloss, Tr. 20.  Thus, JMR's evidence does not show that HPS "always intended" to

17  use the direct drilling method.  *See* JMR Br. at 17.  Rather, JMR's evidence shows, at best, that

18  HPS changed its mind, as was its option, after HPS submitted its bid to use the open cut method

19  instead of the direct drilling method.

20       **ii.    September 2008 − March 2009**

21       43.    HPS was not allowed to do any further excavation after the expiration of the

22  encroachment permit on August 22, 2008.  From Monday, August 25, 2008 through September 9,

23  2008, HPS worked on some incidental repairs on the Pipeline.  Irwin Rebuttal Report, Exh. 624 at

24  15.

25       44.    From September 9, 2008 to March 28, 2009, HPS did not do any work for the

26  Project.  *Id*.; Irwin, Tr. 358-59.  During this period, HPS asked JMR on several occasions when it

27  would be allowed to return to work.  Pourroy, Tr. 321; Exhs. 834, 836, 843.  HPS would often

28  receive no response.  Pourroy, Tr. 321

United States District Court
Northern District of California

45.     The reason for the work stoppage between September 2008 and March 2009 is the source of much dispute between the parties.  The Court finds that there were three main reasons why work was stopped during this time: 1) the delayed delivery of the valves; 2) the dispute about fees for the City's encroachment permit fees; and 3) the delay in having the submittals for the redesign of the laterals and valves approved.  The Court discussed the delayed delivery of the valves in the previous section.  The Court now addresses the permit fee dispute and the submittals for the redesign.

### *The Permit Fee Dispute*

46.     After the Encroachment Permit expired on August 22, 2008, the City offered to issue an extension to the Encroachment Permit once JMR paid its outstanding balance of permit fees and submitted a new down deposit.  Peterson, Tr. 230-32; Exhs. 768, 774.

47.     However, JMR did not believe it was required to pay any additional permit fees, as it had already paid the City of San Ramon a $25,000 deposit at the onset of the Project.  Nixdorf, Tr. 111; Exh. 789.

48.     The permit fees reflected the City's costs of having employees on-site during construction and to write their reports.  Nixdorf, Tr. 111.  The City's permit fees were relatively high in this case because of safety issues and the delays.  Peterson, Tr. 242-43.

49.     Ultimately, the Corps agreed to pay the additional permit fees requested by the City.  B**y** the end of the Project, the permit fees totaled approximately $250,000.  Nixdorf, Tr. 118.

50.     In the winter of 2008-2009, before JMR learned that the Corps would pay for the additional permit fees, JMR told HPS that it would be responsible for the additional permit fees, which JMR believed were the result of HPS's poor performance.  Exhs. 200, 834 at 8436.

51.     The Corps issued a change order for the additional permit fees, and on February 17, 2009, JMR issued two checks in favor of the City in the amounts of $51,358.35 and $20,000.  Morrill, Tr. 531; Exh. 327 at 66-69.  This effectively ended the permit fee dispute.

### *Submittals for Relocating the Valves & Laterals*

52.      The original design for the Project had the butterfly valves connecting the 8-inch laterals to the mainline in the middle of the intersections.  Shields, Tr. 258-59; Exhs. 437-39.

United States District Court
Northern District of California

United States District Court
Northern District of California

53.     In June 2008, the City, HPS and JMR suggested that the Project be redesigned to relocate the valves and laterals away from the intersections.  *See* Figgness, Tr. 582.  Because the pipe was installed in the intersections at a deeper depth, relocating the valves and laterals away from the intersections allowed for time and cost savings.  Morrill, Tr. 529; Figgness, Tr. 582-83.

54.     On September 23, 2008, JMR submitted a Request for Information No. 12 on behalf of HPS to seek the USACE's approval to relocate the valves and laterals outside the intersections.  *See* Exh. 327 at 1.

55.     On November 4, 2008, HPS wrote to JMR in an email: "Also, we plan on re-mobilizing later this week so we are ready to start on Monday with the valve installations and final pipeline work.  Have the proposed relocation drawings been approved by the USACE?  Will we be able to start the remainder of our work Monday ?"  Exh. 834 at 8436.

56.     On January 6, 2009, JMR wrote a letter to HPS asking it to forward the submittals for the relocation of the valves and laterals "at your earliest convenience for submission to the USACE."  Exh. 327 at 14.

57.     The USACE approved the submittals to relocate the laterals away from the intersection on March 20, 2009.  Exh. 327 at 49; Morrill, Tr. 529.  Installation of the laterals and valves could not begin until the Corps approved the submittals.  Shields, Tr. 272-73; Morrill, Tr. 529.

* * *

58.     In finding that the above factors contributed to the delay in this phase of Project, the Court also finds that other factors did not contribute to this delay.  First, the absence of a traffic control plan to install the valves and laterals did not cause any significant portion of this delay.  *See* Rivard, Tr. 610.  Once the submittals for the valves and laterals were approved by the USACE, JMR could put together a traffic control plan for the City to approve within one or two days.  *See id.*

59.     There is also insufficient evidence to indicate that weather or "winterization" was the cause of any delay during this period of time.  The City's manger for the Project, Theresa Peterson, testified that she could not recall whether the installation of the Pipeline was stopped on

1  account of weather.  Peterson, Tr. 234-35.  The contemporaneous evidence shows that the City

2  would have allowed JMR/HPS to continue working if JMR would pay the permit fees.  *See* Exhs.

3  768, 774.  Further, while JMR expert John Elmer constructed an "as-built" schedule that displays

4  a planned winter shut down, Elmer relies on John Morrill for the factual conditions of the Project,

5  and Morrill's expert report does not mention any period in which there would be no progress on

6  the Project due to "winterization."  Elmer Expert Report, Exh. 244 at 9; *see generally*, Morrill

7  Expert Report, Exh. 291.

         **iii.**        **March 2009 − October 2009**

9       60.     Work on the Project resumed on March 29, 2009.  Irwin Expert Report, Exh. 623 at

10  27; Irwin, Tr. 358-59.  By this time, HPS still needed to finish installing the last few hundred feet

11  of the 16-inch mainline, connect the 8-inch laterals to the mainline with the valves, test the

12  Pipeline, and also do the required work on the Pump Station.  *See* Sloss, Tr. 45; Morrill, Tr. 489-

13  90.

14       61.     In April 2009, HPS installed the remaining portion of the mainline.  Then, HPS

15  installed the valves and laterals.  Irwin Expert Report, Exh. 623 at 27.

16       62.     If the valves had been available in the summer of 2008, HPS would have installed

17  the valves and laterals while installing the mainline.  Testimony of Mike Jones ("Jones"), Tr. 56-

18  58.  However, due to the delayed delivery of the valves, HPS had to re-excavate portions of the

19  Pipeline to install the valves, which created more work and increased HPS's and JMR's costs.  *Id.*

20                                 *Chanterella Intersection*

21       63.     HPS continued work without significant difficulties until early June 2009, when

22  problems arose at the Chanterella intersection.  *See* Irwin Expert Report, Exh. 623 at 27.

23       64.     On or before June 5, 2009, HPS installed PVC offsets for a lateral at the

24  Chanterella intersection, but East Bay Municipal Utilities District ("East Bay MUD") objected to

25  the installation and demanded that steel offsets be used.  Jones, Tr. 60-69; Morrill, Tr. 544.  East

26  Bay MUD and Dublin - San Ramon Services District, as partners in an entity known as

27  "DERWA," contributed about 25% of the money for the Project.  Bewley, Tr. 134.

28       65.     HPS eventually installed steel offsets at the direction of JMR and the USACE.  The

United States District Court
Northern District of California

1    steel offsets were not available to be picked up from East Bay MUD until late July 2009.  Exh.

2    476 at Report No. 439.  Thus, HPS stopped working on the Chanterella intersection on July 6,

3    2009, and resumed again on July 20, 2009.  Irwin Expert Report, Exh. 623 at 27.  HPS then

4    continued installation of the Pipeline.

5    　　　　66.    While installing one of the steel offsets, HPS encountered a pipe that supplied a fire

6    hydrant at the elevation for the steel offset depicted on the plans.  Jones, Tr. 62-63.  While the

7    hydrant pipe was marked the plans, "[t]he elevation [of the hydrant pipe] wasn't on the plans."  *Id*.

8    HPS had to re-install the steel offset at a different elevation.  *Id*. at 63.

9    　　　　67.    The delay caused by steel offset requirement was exacerbated by excess water run-

10   off.  Jones, Tr. 59.  The excavation was deeper than the other excavations, and the Chanteralla

11   intersection is located at the bottom of a hill.  *Id*.    On August 20, 2009, JMR described the delay

12   at the Chanteralla intersection as follows:

> This has been an ongoing operation delayed for various reasons.
> The excavation is next to an existing pipe and the area has been
> open longer than would be ideal.  This condition coupled with
> ground conditions affected by excessive water runoff not noted in
> soils reports for that area.  Thus, HPS was dealing with the situation
> the best they could under differing conditions.

17   Exh. 476 at Report No. 461.

18   　　　　　　　　　　　　　*Pipeline Testing*

19   　　　　68.    After completing the installation of the Pipeline, HPS began to test the Pipeline on

20   September 11, 2009.  Irwin Expert Report, Exh. 623 at 28.

21   　　　　69.    Generally, a pipeline is tested at different sections as installation is completed.

22   However, due to the late delivery of the valves, the Pipeline was not tested until it was fully

23   installed.  *See* Irwin Expert Report, Exh. 623 at 27; Exh. 949; Jones, Tr. 64.

24   　　　　70.    HPS discovered the first leak when it started testing the Pipeline in September

25   2009.  Jones, Tr. 64.  HPS did not finish testing the Pipeline until May 26, 2010.  Morrill, Tr. 472;

26   Exh. 271 at 34.

27   　　　　71.    HPS was not, however, testing the pipeline from September 2009 to May 2010.  On

28   or around October 20, 2009, HPS was directed to stop work when JMR was temporarily

United States District Court
Northern District of California

14

terminated from the Project in October 2009, and HPS could not resume work until the City issued another extension to the permit in March 2010.  Irwin Expert Report, Exh. 623 at 28.

### iv.     October 2009 − March 2010

72.     The leaks in the Pipeline delayed HPS's progress past the extension to the encroachment permit.  On September 23, 2009, the City issued a one-week extension on the encroachment permit to September 30, 2009, and informed JMR that this new deadline was "essential."  Exh. 271 at 1.

73.     On Friday, October 2, 2009, JMR issued a "Notice to Comply" for HPS to repair a failed pipe at the Chanterella intersection.  Exh. 271 at 7.  In a letter sent to HPS that day, JMR wrote, "If you fail to continue work this weekend at the Chanterella intersection pipe repair we will be forced to bring in others to perform this work and make appropriate back charges to your contract to cover the cost of this work."  *Id*. at 6.

74.     HPS's crew worked on the repairs on Saturday, October 3, 2009, but not on Sunday, October 4, 4009.  Exh. 271 at 9-10.

75.     On October 4, 2009, the USACE wrote the following in a letter to JMR:

> We have received no reply to our serial letter C-0030 to you and you have failed to perform work on Sunday, October 4, 4009, as you had committed to in order to complete this work per our agreement. Based on these facts, the Government is considering terminating said contract pursuant to the Clause titled 'Default' of the contract clauses.

Exh. 271 at 9.

76.     JMR was verbally terminated by the USACE on Friday, October 16, 2009, after the City refused to issue another extension to the encroachment permit.  Exh. 949; Exh. 271 at 14.  JMR and HPS were directed to vacate the City of San Ramon.  Exh. 476 and Report No. at 519.

77.     In an effort to avoid termination, JMR wrote a letter to the USACE on October 19, 2009, in which JMR listed several "unforeseeable" reasons why the pipeline was not completed by August 22, 2008, and therefore, why JMR should not be terminated: (1) the pipeline portion of the work was to begin on May 1, 2008, but JMR was not issued a Notice to Proceed by the Corps until May 15, 2008; (2) the butterfly valves were a specialty item and were not on site until January

United States District Court
Northern District of California

2009; (3) pipeline testing took longer because valve installation and testing was done out of sequence; (4) the City did not want work to restart until weather permitting in late March 2009; and (5) East Bay MUD's request for steel offsets caused a 60-day delay in June and July 2009. *See* Exh. 949.  HPS contends that JMR's position in this lawsuit−denying liability for certain HPS's change orders−contradicts JMR's representations in the letter regarding HPS's performance.

> 78.   On October 22, 2009, JMR wrote a letter to HPS:
>
>> Gentlemen, As you know from previous verbal conversations, the USACE has verbally terminated JMR's contract on the Sam Ramon project for failure to complete the pipeline work in the time frame granted by the City of San Ramon's encouchment [sic] permit.  As you are well aware, this scope of work is entirely HPS's responsibility…. Please be advised in the event the encoarchment [sic] permit extention [sic] and the USACE terminates the contract, JMR will be holding HPS accountable to the extent HPS caused the issue.

Exh. 271 at 14.

> 79.   The USACE ultimately allowed JMR/HPS to return to work, and the City issued an extension to the encroachment permit to commence on March 15, 2010.  Exh. 408 (encroachment permit extension).

### iv.   March 2010 − August 2010

> 80.   HPS resumed testing the Pipeline on March 15, 2010.  Irwin Expert Report, Exh. 623 at 28.  Testing of the Pipeline was complete by May 26, 2010.  Morrill, Tr. 472; Exh. 271 at 34.

> 81.   After HPS finished testing the Pipeline, HPS resumed work on the Pump Station and other change order work approved by the USACE.  Irwin Expert Report, Exh. 623 at 22.

> 82.   In June of 2010, after HPS had completed installing and testing the Pipeline, the USACE issued the change order incorporating Specification 01660 into the Prime Contract.  *See* Morrill Reply Report, Exh. 293 at 8.  Specification 01660 clarifies that the Pipeline and the Pump Station had to be tested together.  *See id*.

### D.   JMR's Request for Equitable Adjustment

> 83.   The final testing of the Pump Station and Pipeline was completed on August 17,

1    2010, though HPS did not do further work on the Pipeline after May 26, 2010.  *See* Exhibit 539 at

2    5 (Price Negotiation Memorandum).

3              84.    As noted above, the contractual deadline to complete the Project was May 16,

4    2009.  Prime Contract, Exh. 329 at 21.  Thus, the final completion of the Project was delayed by

5    459 days between May 16, 2009 and August 17, 2010.

6              85.    On May 4, 2011, JMR submitted a Request for Equitable Adjustment ("REA") to

7    the USACE, in which JMR sought compensation for all 459 calendar days of delay between the

8    contractual deadline of May 16, 2009 and the final completion on August 17, 2010.  JMR REA,

9    Exh. 523 at 1-3.

10             86.    In the REA, JMR alleged that the USACE was responsible for all 459 days of

11   delay.  *See* Exh. 523 at 3.  JMR took the position that "the Pipeline impacts were not critical and

12   therefore did not control nor dictate the delay to the Project Completion."  *Id*. at 7.

13             87.    The Corps and JMR held formal negotiations regarding the REA in March, July

14   and September of 2012.  *See* Exh. 539 at 6.  HPS was not a participant in the REA negotiations.

15             88.    The USACE and JMR negotiated a settlement of the REA, the terms of which were

16   memorialized in a Price Negotiation Memorandum ("PNM").  *See* Exh. 539.  The PNM reflects

17   that the settlement was divided into two parts: (1) JMR's submission of 17 of "itemized project

18   damages," which included change order requests that JMR had previously submitted on HPS's

19   behalf, but which the USACE had already denied; and (2) JMR's claim for 459 days of delay.

20   PNM, Exh. 539 at 1-6.

21             89.    With few exceptions, the USACE denied all of the change order requests JMR

22   submitted on behalf of HPS.  The USACE approved a few of HPS's proposed change orders

23   ("PCOs"), including PCO 40 ($3,244), PCO 59 ($3,683), and partially approved PCO 53, which

24   HPS submitted in the amount of $11,859.

25             90.    JMR was compensated for 320 days of delay out of the 459 days JMR requested.

26   PNM, Exh. 539 at 3; Testimony of Gerado Prado ("Prado"), Tr. 281.  JMR was compensated at

27   the rate of $2,052 per day, and was paid an additional $43,310 for other the REA preparation and

28   follow-up work in 2012.  PNM, Exh. 539 at 6.  Thus, JMR received $699,950 with respect to the

United States District Court
Northern District of California

1    delay claim issues.  *Id.* at 4.

2        91.    JMR was also granted a 459-day time extension, which includes 320 days of

3    compensable delay and 139 days of concurrent, non-compensable delay.  PNM, Exh. 539 at 6.   If

4    JMR had not been granted this time extension in the REA, it would have been liable for $2,800 in

5    liquidated damages for each day of delay.  *See* JMR REA, Exh. 523 at 4.

6        92.    An Administrative Contracting Officer made the final decision for the USACE.

7    Prado, Tr. 298.

8    **E.    Overview of Parties' Claims**

9        93.     HPS has filed a breach of contract claim against JMR, and a Miller Act claim

10   against JMR and USACE.  Through these claims, HPS seeks to recover damages associated with

11   various change orders that JMR submitted to the USACE, but which the USACE rejected.  The

12   parties dispute whether HPS should be compensated for the following PCOs:

13   PCO 23       Delay claim for work stoppage from August 2008 to March 2009 ($121,255.97);
     PCO 7        Cost of installing valves out of sequence ($24,105.69);
14   PCO 9        Cost of accelerating work crew in August 2008 ($21,456);
15   PCO 24       Additional cost of using the direct drilling method over open cut method ($52,413);
     PCO 44       Cost of installing steel offsets at Chanterella intersection ($8,841);
16   PCO 51       Cost of re-installing a steel offset at Chanterella intersection after hydrant pipe was
                  discovered in the path of the Pipeline ($4,132);
17   PCO 53       Cost of installing a test plate for which JMR was partially compensated through the
18                REA process ($11,859).

19       94.    There are additional PCOs for which HPS initially sought compensation, but has

20   now conceded and withdrawn as a basis for recovering damages.  HPS Proposed Conclusions of

21   Law at 23, ¶ 3.  These include PCOs 6, 8, 15, 20, 22, 49, 50, which all reflect the extra costs HPS

22   allegedly incurred when HPS encountered obstructions in the path of the Pipeline.  *See id.*

23       95.    JMR has also conceded liability for PCOs 40 and 59.  *See* Reply at 16 ("PCOs 40

24   and 59 were paid by the COE on behalf of HPS and are valid claims.").  These claims are valued at

25   $3,244 and $3,683, respectively.

26       96.    JMR has also filed a counter-claim against HPS.  JMR's counter-claim is

27   comprised of three main parts: (1) JMR's delay claim, through which JMR seeks *Eichleay*

28   damages for critical path delay on the Pipeline from December 23, 2009 to May 26, 2010; (2)

United States District Court
Northern District of California

18

1  Backcharge No. 1, through which JMR seeks damages for HPS's failure to perform work as

2  required by the Subcontract; (2) and Backcharge No. 2, through which JMR seeks damages for the

3  costs of testing, traffic control and paving incurred by JMR after the milestone deadline of August

4  22, 2008.  JMR seeks $341,062.00 for its delay claim, $93,234.41 for Backcharge No. 1, and

5  $308,282.62 for Backcharge No. 2.

6  **II.     CONCLUSIONS OF LAW**

7  **A.     The Miller Act**

8      1.     Under the Miller Act, "[b]efore any contract of more than $100,000 is awarded for

9  the construction, alteration, or repair of any public building or public work of the Federal

10  Government, a person must furnish to the Government" a "payment bond with a surety … for the

11  protection of all persons supplying labor and material in carrying out the work provided for in the

12  contract for the use of each person."  40 U.S.C. § 3131(b)(2).

13      2.     "The Miller Act is the modern-day remedy to the historical dilemma faced by

14  contractors and materialmen denied compensation in federal construction projects." *Technica*

15  *LLC ex rel. U.S. v. Carolina Cas. Ins. Co.*, 749 F.3d 1149, 1151 (9th Cir. 2014).  "A mechanic's

16  lien under state law against improved property provides security for suppliers of labor and material

17  to private construction projects, but a mechanic's lien cannot attach to government property."

18  *United States ex rel. T.M.S. Mechanical Contractors v. Millers Mutual Fire Ins. Co. of Texas*, 942

19  F.2d 946, 949 (5th Cir. 1991).  Thus, the Miller Act "provides an alternative to a mechanic's lien"

20  in federal construction projects.  *Id.*

21      3.     The Miller Act creates a cause of action in favor of all furnishers of labor and

22  materials to recover the amount due under the contract:

23          Every person that has furnished labor or material in carrying out
           work provided for in a contract for which a payment bond is
24          furnished under section 3131 of this title and that has not been paid
           in full … may bring a civil action on the payment bond for the
25          amount unpaid at the time the civil action is brought and may
           prosecute the action to final execution and judgment for the amount
26          due.

27  40 U.S.C. § 3133(b)(1).  "A provider of labor or materials is entitled to all sums justly due,

28  meaning that the provider is entitled to be paid in full under the subcontract."  *United States ex rel.*

United States District Court
Northern District of California

1   *Taylor Construction, Inc. v. ABT Service Corp. Inc.*, 163 F.3d 1119, 1122 (9th Cir 1998).

2   "[T]here is no doubt that under the Miller Act recovery for work performed under the subcontract

3   is the amount due under the subcontract." *Id.* (citing cases).

4          4.     "As a general matter, a surety's liability is defined by the liability of the underlying

5   contract." *Morganti Nat'l, Inc. v. Petri Mechanical Co., Inc.*, No. 98-0309, 2004 WL 1091743, at

6   *11 (D. Conn. May 13, 2004).  Indeed, "[i]t is a cardinal rule of the surety/principal relationship

7   that a surety occupies the shoes of its principal and 'may avail himself of any defense' available to

8   the principal other than those that are purely personal, such as bankruptcy or infancy."  *United*

9   *States ex rel. Walton Technology v. Westar Engineering*, 290 F.3d 1199, 1209 (9th Cir. 2002)

10  (Trott, J., dissenting) (citing 72 C.J.S. *Principal and Surety* § 189 at 318-19 (1987)).  Accordingly,

11  this general rule provides that "if a principal and surety are jointly sued and the action fails as to

12  the principal, the surety is for that reason discharged and judgment against it cannot be taken."

13  *Am. Cas. Co. of Reading, Pa. v. Arrow Road Const. Co.*, 309 F.2d 923, 924 (9th Cir. 1962).

14         5.     There is, however, an exception to this general rule for Miller Act sureties.  "In the

15  context of Miller Act cases," courts "must look beyond the principal's contractual liability, to the

16  Miller Act itself, in defining the limits of coextensive liability between surety and its principal."

17  *Walton Technology*, 290 F.3d at 1206.  "It is clear that 'the surety's liability on a Miller Act bond

18  must be at least coextensive with the obligations imposed by the Act if the bond is to have its

19  intended effect.' "  *Id.* (quoting *Sherman*, 353 U.S. at 215-16).  "Thus, the liability of a surety and

20  its principal on a Miller Act payment bond is coextensive with the contractual liability of the

21  principal only to the extent that it consistent with the rights and obligations created under the

22  Miller Act."  *Walton Technology*, 290 F.3d at 1206; *see also Morganti Nat'l, Inc. v. Petri*

23  *Mechanical Co., Inc.*, No. 98-0309, 2004 WL 1091743, at *11 (May 13, 2004) (noting that the

24  general rule "is true for a Miller Act surety with the exception that this rule cannot, of course,

25  conflict with the actual terms of the Miller Act.").

26         6.     Thus, there are circumstances in which a surety is *not* entitled to use the principal's

27  contract defenses to defend against liability under the Miller Act.  For instance, in *Walton*, the

28  subcontract contained a clause requiring the contractor to pay the subcontractor only "when and if

United States District Court
Northern District of California

paid by the Navy." *Walton*, 290 F.3d at 1203.  Finding that enforcement of the "pay if paid" clause contradicted the express terms of the Miller Act, and constituted an invalid "implied waiver of Walton's rights under the Miller Act," the Ninth Circuit reversed the district court's grant of summary judgment in favor of the surety.  *Walton*, 290 F.3d at 1208-09.

7.      In *Walton*, the Ninth Circuit found that the "pay if paid" clause in the subcontract affected the subcontractor's *right of recovery* under the Miller Act.  The court explained:

> A subcontractor's right of recovery on a Miller Act payment bond accrues ninety days after the subcontractor has completed its work, not "when and if" the prime contractor is paid by the government. Permitting a Miller Act surety to avoid liability on the payment bond based on an unsatisfied "pay when and if paid" clause in the subcontract would, for all practical purposes, prohibit a subcontractor from exercising its Miller Act rights until the prime contractor has been paid by the government.  In cases where the government does not pay the prime contractor within the one year statute of limitations period, the subcontractor would be barred from asserting its Miller Act rights.

*Walton*, 290 F.3d at 1208.

8.      Generally, in Miller Act cases, courts look to Subcontract terms to determine the "measure of recovery."  *Taylor Construction*, 163 F.3d at 1122 ("The Ninth Circuit has consistently followed that method and used the underlying bonded subcontract as the measure of recovery in Miller Act cases.") (citing *Colvin v. United States ex rel. Magini Leasing & Contracting,* 549 F.2d 1338, 1342 (9th Cir.1977) (basing recovery on "the terms of the contract"); *United States ex rel. A.V. DeBlasio Construction Inc. v. Mountain States Construction Co.,* 588 F.2d 259, 262–63 (9th Cir.1978) (approving award of damages because it was in accordance with the provisions of the contract)).

9.      In *Walton*, the Ninth Circuit noted that there is a distinction between contract terms that determine the measure of recovery in a Miller Act case from contract terms which affect the right of recovery under the Miller Act:

> Considerable differences exist between a case in which the *measure of recovery* in a Miller Act case is determined by reference to subcontract terms governing how work performed under the subcontract will be compensated and one in which the timing of

United States District Court
Northern District of California

recovery, and, in some cases, the right of recovery under the Miller Act is dictated by such terms.

*Walton*, 290 F.3d at 1207 (emphasis added).  The court held that "[w]here subcontract terms effect the timing of recovery or the *right of recovery* under the Miller Act, enforcement of such terms to preclude Miller Act liability contradict the express terms of the Miller Act."  *Id.* (emphasis added).

10.     A Miller Act surety may assert a counterclaim against a Miller Act claimant to offset the amount owed under the Miller Act, but only if the claimant is in direct contractual relationship with the principal of the payment bond.  *U.S. ex rel. Bartec Indus., Inc. v. United Pac. Co.*, 976 F.2d 1274, 1278 (9th Cir. 1992) *opinion amended on denial of reh'g*, 15 F.3d 855 (9th Cir. 1994) (declining to offset a Miller Act claim by the amount owed under a counterclaim because the Miller Act claimant, a supplier of steel, was not in privity with the principal); *U.S. for Use & Benefit of Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F.2d 759, 762 (9th Cir. 1984) (same).

**B.     Section 8.4 of the Subcontract**

11.     Defendants contend that Section 8.4 of the Subcontract unequivocally binds HPS to the USACE's decision to deny the PCOs submitted on HPS's behalf.  Therefore, Defendants contend that section 8.4 precludes JMR's liability on HPS's breach of contract claim relating to unapproved PCOs.[2]

---

[2] JMR also contends that section 6.5.2 unequivocally binds HPS to the USACE's previous decision to deny the PCOs.  The Court disagrees.  Section 6.5.2 provides that "[i]n the event of any dispute or claim between Contractor and Owner which directly or indirectly involves" the Subcontractor, the Subcontractor is bound to "all decisions, findings or determinations" that are made by a "person so authorized in the Owner-Contract Agreement, or by an administrative agency or court of competent jurisdiction or by arbitration, whether or not Subcontractor is party thereto."  Subcontract, Exh. 328 at 15-16.  HPS's PCOs were ultimately rejected through a REA settlement process between JMR and the USACE.  There were no "decisions, findings or determinations" on the PCOs rendered by "an administrative agency or court of competent jurisdiction or by arbitration," to which HPS would be bound under section 6.5.2.  Nor has JMR shown that the decision to deny the PCOs was made "by the person so authorized in the Owner-Contractor Agreement."  JMR has cited no authority for the proposition that a subcontractor is bound to the final REA settlement negotiation between a contractor and the government.  Accordingly, the Court finds that section 6.5.2 does not preclude JMR's liability to HPS for the PCOs which have been rejected by USACE.

United States District Court
Northern District of California

12.     The Court agrees.  Section 8.4 of the Subcontract provides that JMR is not liable to HPS for damages described in a PCO if the USACE considered and rejected the PCO:

> Notwithstanding any other provision, if the Subcontract Work for which the Subcontractor claims additional compensation is determined by the [USACE] not to entitle the Contractor to a Change Order, additional compensation or a time extension because such work is within the scope of the Subcontract Work as defined by Paragraph 3.1, then the Contractor shall not be liable to the Subcontractor for any additional compensation or time extension for such Subcontract Work, unless the Contractor agrees in writing to pay such additional compensation or to grant such extension.

Exh. 328 at 21.  HPS's claims in this case were first presented to the USACE via JMR's submission of PCOs on HPS's behalf.  The USACE denied payment for these PCOs.  JMR never agreed in writing to pay additional compensation for any of HPS's PCOs.  Accordingly, under section 8.4 of the Subcontract, JMR is not liable to HPS for the PCOs which have been rejected by USACE, which include the disputed PCOs 7, 9, 23, 24, 44, 51 and 53.

13.     JMR also contends that section 8.4 affects the "measure of recovery" under the Subcontract, and therefore, also precludes GAIC's liability under the Miller Act for the unapproved PCOs.  The Court disagrees.  Section 8.4 grants the USACE the sole authority to determine whether HPS is entitled to a PCO.  The USACE has such authority notwithstanding HPS's right to recover under the Miller Act.  Assuming *arguendo* that USACE has wrongfully denied one or more PCOs, "enforcement of [section 8.4] to preclude Miller Act liability [would] contradict the express terms of the Miller Act."  *Walton*, 290 F.3d at 1206.

14.     Moreover, the USACE only approves a change order if there is a "change" in the contract work to be performed that is the responsibility of the USACE.  However, the USACE denies a change order request if HPS or JMR create the circumstances that require a change in the contract work regardless of whether it was HPS or JMR who created such circumstances.  Therefore, even if USACE rightfully denies one or more PCOs, HPS may still have a right to recover under the Miller Act if JMR is responsible for the circumstances that required the change.

15.     The Court's conclusion that section 8.4 may affect the "right to recovery" under the Miller Act is supported by at least one other district court's decision.  In *Foundation Fence, Inc. v.*

*Kiewit Pacific*, a court from the Southern District of California considered whether the following contract provision, which is similar to section 8.4 in the Subcontract between HPS and JMR, affected the right of recovery or the measure of recovery:

> For changes in the Prime Contract that have been initiated by Owner, for acts or omissions of the Owner and for defects in the Prime Contact, Subcontractor shall submit any claims it may have, including notice thereof, for adjustment in the price, schedule or other provisions of the Subcontract to Contractor in writing in sufficient time and form to allow Contractor to process such claims within the time and in the manner provided for and in accordance with the applicable provisions of the Prime Contract. Subcontractor agrees that it will accept such adjustment, if any, received by Contractor from Owner as full satisfaction and discharge of such claim.

No. 09-2062, 2010 WL 4024877, at *2 (S.D. Cal. Oct. 13, 2010).  The court found that under the Ninth Circuit's decision in *Walton*, the foregoing contract provision operated as an "implied waiver" of the subcontractor's rights under the Miller Act.  *Id*. at *3; *see also U.S. for Use & Benefit of U.S. Prefab, Inc. v. Norquay Const., Inc.*, No. 06-1598, 2007 WL 1839279, at *7 (D. Ariz. June 26, 2007) (noting that a similar contract provision "appears to be an attempt to obtain a waiver of Prefab's Miller Act rights….").

16.     Defendants seek to distinguish *Foundation Fence* on the basis that the foregoing contractual provision has more "restrictive language" than section 8.4.  JMR Br. at 12.  This argument is without merit.  Defendants are correct to note that section 8.4 does not include language that makes the grant of an "adjustment, if any," constitute "full satisfaction and discharge of such claims."  However, Defendants ignore the plain fact that section 8.4 has the same effect on HPS's Miller Act rights as the provisions in the *Foundation Fence* subcontract had on the subcontractor in that case.  In both cases, the provisions preclude the subcontractor from bringing a claim in the event the owner decides a change order or "adjustment" is not warranted.  When such a change order is warranted and otherwise recoverable under the Miller Act, these terms constitute implied waivers of a Miller Act claimant's rights.  *Walton*, 290 F.3d at 1208-09.

//

//

24

**C.      HPS's Claims**

17.     The Subcontract price is $1,293,130.  Subcontract, Exh. 328 at 16, 30.  It is also undisputed that the USACE approved change orders submitted on HPS's behalf in the amount of $121,695.  Further, JMR does not dispute only having paid HPS $1,089,316.28, which leaves a current balance of $325,508.72.

18.     JMR has withheld $325,508.72 from HPS under Sections 7.3.8 and 7.3.9 of the Subcontract, which grant JMR the right "to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom," including "possible" damages resulting from defective work, delay and third-party claims. Subcontract, Exh. 328 at 18.

19.     As discussed above, a surety may offset amount owed under Miller Act if principal and claimant are in privity, as is the case here with HPS and JMR.  *Bartec Indus.*, 976 F.2d at 1278; *Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F.2d 759, 762 (9th Cir. 1984) (same).  Therefore, HPS is entitled to recover the undisputed amount to the extent that amount is not offset by JMR's counterclaim.

20.     As noted above, HPS has withdrawn its claims relating to obstructions in the path of the Pipeline.  HPS Proposed Conclusions of Law at 23, ¶ 3.  These include PCOs 6, 8, 15, 20, 22, 49, 50.  Accordingly, these claims are denied.

21.     JMR has also conceded the merits of HPS's PCOs 40 and 59, valued at $3,244 and $3,683, respectively. *See* JMR Reply Br. at 16 ("PCOs 40 and 59 were paid by the COE on behalf of HPS and are valid claims.").  Thus, the additional undisputed amount of $6,927 is due to HPS if no offset applies. Accordingly, without consideration of any offsets based on JMR's counterclaim, JMR and GAIC are jointly and severally liable to HPS for the undisputed amount of $332,435.72.

**i.      Delay Claim (PCO 23)**

22.     HPS seeks damages in the amount of $121,255.97 for costs associated with the work stoppage from September 11, 2008 to March 29, 2009.  These damages consist of unabsorbed home office overhead and field standby costs.  DenHerder, Tr. 407; Exhs. 600-01, 605.  For the following reasons, this claim is denied.

United States District Court
Northern District of California

23.     Provisions in the Subcontract indicate that HPS can only recover for delay that was within the sole control of JMR.  Section 6.5.3 states that the Subcontractor may recover "direct damages resulting from unreasonable delay caused *solely* by the Contractor."  Subcontract, Exh. 328 at 16 (emphasis added).  Section 6.5.1 governs *owner*-caused delay, and provides that the "Subcontractor shall *not* be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such [owner-caused] delays, except as otherwise permitted by law."  *Id*. at 15 (emphasis added).  Accordingly, under the Subcontract, HPS may recover damages for a delay within the sole control of JMR, but HPS may not recover delay damages to the extent USACE was in control.

24.     In the context of HPS's Miller Act claim, section 6.5.1's preclusion of HPS's right to recover delay damages if USACE caused the delay requires further analysis.  In *Mai Steel Service Inc. v. Blake Construction Co*., the Ninth Circuit held that recovery of out of pocket expenses attributable to a delay from a general contractor's Miller Act surety is not limited to situations in which the delay was caused by the general contractor.  981 F.2d 414, 418 (9th Cir. 1992).  In *Mai*, a subcontractor recovered damages attributable to delay from the contractor's surety even though the delay was caused by another subcontractor, and not the contractor.  *Id*. at 414.  Similarly, in *Millers Mutual*, the Fifth Circuit held that a subcontractor was allowed to recover from the Miller Act surety damages resulting from a delay caused by government change orders.  *Miller Mutual*, 942 F.2d at 951.  However, in neither *Mai* nor *Millers Mutual* was there any discussion of an underlying subcontract term that specifically precluded the subcontractor's recovery for delay if the contractor was not solely at fault.

25.     Moreover, there is authority in support of the position that section 6.5.1, which precludes HPS's recovery for owner-caused delay, affects the "measure of recovery" as opposed to the "right to recovery," and therefore, does not constitute an implied waiver of Miller Act rights under *Walton*.  In *Morganti*, a district court from the District of Connecticut held that a subcontract clause precluding the recovery of any damages for delay "affects the measure of damages, i.e., whether there is any liability for monetary damages."  *Morganti*, 2004 WL 1091743, at *11.  The court found that this clause "simply delineates the extent of the general

26

contractor's liability or, in the context of the Miller Act, what sums are 'justly due' to the subcontractor." *Id*.  Accordingly, the *Morganti* court found that "the 'no damages for delay' clause just as much defines liability for [the surety] as it does the liability of [the contractor]...." *Id*.

26.     The Court ultimately need not decide whether HPS may recover delay damages under the Miller Act if the USACE was at fault for the delay.  Section 10.2.3 of the Subcontract provides:

> Neither the Subcontract Price nor the Schedule of the Subcontract
> Work shall be adjusted under this Article for any suspension, delay
> or interruption to the extent that performance would have been
> suspended, delayed or interrupted *by the fault or negligence of the
> Subcontractor or by a cause for which Subcontractor would have
> been responsible*.

Subcontract, Exh. 328 at 24 (emphasis added).  In addition, the Ninth Circuit held in *Mai* that recovery of damages for delay under the Miller Act "would be inappropriate" in instances "when the delay is attributable to the subcontractor's own conduct."  *Mai Steel*, 981 F.2d at 419 n. 8; *see also Millers Mutual*, 942 F.2d at 952 n. 14 ("A subcontractor cannot recover from a Miller Act surety for additional or increased costs caused by its own delay.").  Accordingly, under both the Subcontract and the Miller Act, it is clear that HPS cannot recover delay damages to the extent HPS was at fault for the delay.

27.     The Court finds that HPS cannot recover delay damages for the work stoppage between August 2008 and March 2009 because HPS is at least partly responsible for this entire period of delay.  More specifically, the Court finds that (1) HPS is responsible for the delay until November 3, 2008 when the valves arrived in California; (2) HPS is responsible for the delay caused by the permit fee dispute until February 17, 2009; and (3) HPS has not shown that it is not responsible for the untimely approval of submittals for the redesign of the laterals and valves.

### *Valves*

28.     As discussed above, the delayed delivery of the valves was the primary reason HPS was unable to meet the August 22, 2008 milestone deadline.  Section 4.1 of the Subcontract provides that HPS "shall be responsible for … ordering of materials and all other actions as

27

1    required to meet the Schedule of Work." Subcontract, Exh. 328 at 6.  HPS does not dispute its

2    contractual obligation to timely supply the butterfly valves to be installed on the Pipeline.

3            29.      HPS nonetheless contends that it was not responsible for the delayed delivery of the

4    valves.  HPS Br. at 17.  There was a 10 to 14 week manufacturing lead time for the valves, and

5    that lead time only commenced after the USACE approved the submittals for the valves on July

6    25, 2008.  R&B also testified that it does not receive a "firm" lead time until after the USACE

7    approves submittals.  Vincellete, Tr. 125.  There is also evidence which shows that HPS did not

8    learn of the 10 to 14 week lead time until July 25, 2008.  Exh. 731; Pourroy, Tr. 316; Vincellete,

9    Tr. 125.

10           30.      However, HPS was unaware of the long lead time until July 25, 2008 because of

11   poor communication between HPS and HPS's subcontractor, R&B.  R&B was informed on March

12   22, 2008 by the manufacturer, Henry Pratt Company, that the valves would have a lead time of 10

13   to 14 weeks after an offer was received and the submittals were approved.  Vincellete, Tr. 120;

14   Pourroy, Tr. 123; Exh. 738 (indicating that the valves had a "Lead Time" of "10-14 Weeks ARO

15   Approved Submittals").  Although R&B had this information prior to the time in which HPS

16   submitted its bid to JMR, R&B did not share this information with HPS until months had passed

17   and the Project was already underway.

18           31.      HPS is responsible for the acts and omissions of R&B in the performance of

19   R&B's work to procure the valves because R&B was HPS's subcontractor.  HPS is responsible for

20   the acts of its chosen subcontractors.  At a minimum, HPS was responsible for determining

21   whether it could fulfill its contractual obligations *before* it bid on the Project.  *See* 5 Bruner &

22   O'Connor Construction Law § 15:24 ("A party is legally responsible for its own acts and

23   omissions as well as acts and omissions of those vicariously within its legal 'control.' ").

24   Accordingly, the Court finds that HPS was responsible for the delayed delivery of the valves.

25           32.      HPS also contends it is not responsible for the delayed delivery of the valves

26   because there was a defective specification for the valves.  HPS made this argument for the first

27   time at trial.  DenHerder, Tr. 429-32; Irwin, Tr. 355-56.

28           33.      The Court finds that the specification for the valves was not defective.  Section

15112 of the specifications provides: "*Unless otherwise specified*, all valves shall be left hand to open (counterclockwise)."  Exh. 424 at 2 (emphasis added).  The Court finds that the plans for Project indeed specified that the valves for the Pipeline opened clockwise, as note 7 in Detail 8 provides: "*Buried valves shall open clockwise*," Exh. 441, and the valves installed in the Pipeline were buried valves, DenHerder, Tr. 429.

34.     HPS argues that note 7 in Detail 8 does not show that specifications were not defective because Detail 8 is not in the specifications.  However, section 15112 does *not* state that all valves are counterclockwise "unless otherwise specified *in the specifications*."  Under the plain language of section 15112, which does not limit the documents which may indicate an irregular type of valve to the specifications, it would be reasonable to include specifications, contract documents, and the Project plans.

35.     In any event, section 00700 of the specifications provides: "Anything mentioned in the specifications and not shown on the drawings, *or shown on the drawings and not mentioned in the specifications*, shall be of like effect as if shown or mentioned in both.  In the case of *difference* between drawings and specifications, the specifications shall govern."  Exh. 278 at 99 (emphasis added).

36.     Because section 15112 of the specifications only states that valves open counterclockwise "[u]nless otherwise specified," and because note 7 in Detail 8 specifies that the valves buried with the Pipeline open clockwise, the Court finds that there was no "difference between [the] drawings and specifications."  Exh. 278 at 99.  Instead, the requirement that the valves open clockwise was "shown on the drawings and not mentioned in the specifications," and therefore, "shall be of like effect as if shown or mentioned in both."  *Id*.

37.     Further, even if there was a "difference" between the drawings and specifications with respect to the valves, *id.*, section 4.2 of the Subcontract requires HPS to "make a careful analysis and comparison of the drawings, specifications, other Subcontract Documents, and information furnished by the Owner relative to the Subcontract Work," and to notify JMR of any inconsistencies within three days of its discovery.  Exh. 328 at 6.  Section 4.2 further provides that "[i]f the Subcontractor fails to perform the obligations of this paragraph, the Subcontractor shall

29

1    pay such costs and damages to the Contractor as would have been avoided if the Subcontractor

2    had performed such obligations." *Id.*

3         38.    Accordingly, the Court finds that HPS was responsible for the delayed delivery of

4    the valves.   The evidence shows that the valves did not arrive in California until the first shipment

5    arrived on October 28, 2008 and the second shipment arrived on November 3, 2008, months after

6    the August 22, 2008 deadline.  Irwin, Tr. 370.  Accordingly, the Court finds HPS responsible for

7    this delay between September 2008 and November 3, 2008.

8    *Permit Fee Dispute*

9         39.    The Court also finds HPS has responsibility for the delay caused by the permit fee

10   dispute, which did not end until the USACE issued a change order and JMR paid the City of San

11   Ramon for the additional encroachment permit fees on February 17, 2009.  While JMR is

12   responsible for not resolving this dispute expeditiously, the Court also finds that HPS contributed

13   the circumstances that required an extension of the permit and the increase in permit fees.

14        40.    HPS would not have needed an extension to the encroachment permit to finish

15   installation of the Pipeline if HPS had complied with its contractual obligation to finish installing

16   the Pipeline by August 22, 2008.  The delayed delivery of the valves was the primary reason HPS

17   did not meet the deadline.  Other events that were within the control of HPS also caused delay,

18   such as the obstructions that were encountered as a result of HPS's failure to pothole, the safety

19   Stand-Down, and HPS's 47 failed compaction tests.

20        41.    Moreover, the dispute about the encroachment permit was tied to the City's

21   subsequent demand for a large increase in fees.  These fees reimburse the City for the staff time

22   City employees spent on the Project.  Peterson, Tr. 242.  Due to the safety issues and long duration

23   of the Project, the City's staff spent a lot of time at the site of the Project, which caused the fees to

24   be very high. *See id.* at 242-43.

25   *Submittals*

26        42.    Even after the valves arrived and the permit fee dispute was resolved, HPS was

27   unable to return work because the submittals for the redesign of the valves and laterals had not

28   been approved by the USACE.  The USACE approved the submittals to relocate the laterals away

United States District Court
Northern District of California

from the intersection on March 20, 2009.  Exh. 327 at 49; Morrill, Tr. 529.  HPS resumed its work

on the Pipeline shortly thereafter on March 29, 2009.  Irwin Expert Report, Exh. 623 at 27.

43.     Under Section 4.9 of the Subcontract, HPS is responsible for the timely approval of

its submittals:

> The Subcontractor shall promptly submit for approval to the
> Contractor all shop drawings, samples, product data, manufacturers'
> literature and similar submittals required by the Subcontract
> Documents.  The Subcontractor shall prepare and deliver its
> submittals to the Contractor in a manner consistent with the
> Schedule of Work and in such time and sequence so as not to delay
> the Contractor or others in the performance of work.

Subcontract, Exh. 328 at 7.  HPS has not disputed this contractual obligation.

44.     JMR presented testimony that HPS delayed in submitting all of the submittals

required for the valve redesign, and that USACE ultimately approved the submittals on March 20,

2009.  Exh. 327 at 49; Morrill, Tr. 529.  HPS has not presented evidence to rebut this evidence.

Accordingly, the Court also finds that HPS has responsibility for this delay.

\* \* \*

45.     Even if HPS were not responsible for the work stoppage between September 2008

and March 29, 2009, HPS would not be able to recover the full amount of its delay claim, which

HPS currently values at $129,716.  HPS submitted PCO 24 seeking $44,968 in damages for the

delay from November 3, 2008 until December 8, 2008.  *See* Exh. 581.  HPS seeks damages

relating to the time period after the initial PCO was submitted on December 2, 2008.  However,

HPS was required under sections 6.5.2 and 6.5.4 of the Subcontract to submit additional PCOs

covering that time.  Subcontract, Exh. 328 at 15-16.  HPS did not.  Accordingly, HPS failed to

give JMR timely notice of the full extent of its delay claim.

46.     Moreover, under the Miller Act, HPS cannot recover the portion of requested

damages that constitute rent for its own equipment.  The "use value of [HPS]'s own equipment for

the period of delay [does] not constitute 'labor or material' within the meaning of the Miller Act."

*Millers Mutual*, 942 F.2d at 952 (citing *United States ex rel. Edward E. Morgan Co. v. Maryland

Casualty Co.*, 147 F.2d 423, 425 (5th Cir. 1945)); *see also Mai Steel*, 981 F.2d at 417 (finding the

31

Fifth Circuit's decision in *Millers Mutual* "persuasive."). Rather, the use value of a subcontractor's own equipment "is far more analogous to lost profits−for which recovery against the surety is not allowed−than to actual expenditures for labor or materials utilized in the performance of the subcontract−for which [recovery] is allowed." *United States ex rel. Pertun Construction Co. v. Harvesters Group, Inc.*, 918 F.2d 915, 918 (11th Cir. 1990) (citing *Morgan*, 147 F.2d at 425).

47.    Finally, to the extent HPS seeks to recover home office overhead on its breach of contract claim by using the *Eichleay* formula,[3] HPS has failed to satisfy the "strict prerequisites for application of the formula." *Nicon, Inc. v. United States*, 331 F.3d 878, 883 (Fed. Cir. 2003). To use the *Eichleay* formula, there must have been a delay of uncertain duration, that was not caused by the party seeking *Eichleay* damages, and the party seeking damages must have been "on standby and unable to take on other work during the delay period." *Id*. The Court has already explained how HPS failed to prove it was not responsible for the delay. Moreover, HPS has not submitted any evidence to show it was unable to take on other work from September 2008 to March 2009.

### ii.    Valves out of Sequence (PCO 7)

48.    HPS seeks damages in the amount of $24,105.69[4] for the costs associated with

---

[3] The *Eichleay* formula is used to "equitably determine allocation of unabsorbed overhead to allow fair compensation of a contractor for government delay." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1578 (Fed. Cir. 1994). The formula was first developed by the Armed Services Board of Contract Appeals in *Eichleay Corp.*, 60-2 B.C.A. (CCH) ¶ 2688 (1960), *aff'd on reconsideration*, 61-1 B.C.A. (CCH) ¶ 2894 (1961). That formula requires the following three-step analysis:

> [1] The total home office overhead for the contract performance period is multiplied by the ratio of contract billings to total company billings; this calculation results in the amount of home office overhead allocable to the contract. [2] That amount is then divided by the number of days of contract performance; the result is the daily home office overhead rate allocable to the contract. [3] That rate is then multiplied by the number of days of delay; the result is the amount of recovery.

*George Hyman Constr. Co. v. Washington Metro. Area Transit Authority*, 816 F.2d 753, 757 (D.C. Cir. 1987).

[4] HPS initially sought $38,919 for this claim, and HPS submitted a revised PCO 7 for this amount. *See* Exh. 591. HPS writes in its brief: "JMR rightfully contended that 20 couplings included in the change order would have been required whenever the valves were installed. HPS

United States District Court
Northern District of California

having to install ten butterfly valves after the main pipeline had been installed, buried and paved. *See* Exh. 591.  If the valves had been available during the first phase of construction in the summer of 2008, HPS would have installed them while installing the mainline of the pipeline.  Jones, Tr. 56-58.  Installing the valves after already installing the mainline increased HPS's costs.  Pourroy, Tr. 312.

49.     The delayed delivery of the valves was the responsibility of HPS.  Section 10.2.3 provides that the Subcontractor will not be entitled to any additional costs or time "to the extent that the performance would have been suspended delayed or interrupted by the fault or negligence of the Subcontractor or by a cause for which a Subcontractor would have been responsible."  *Id.* at 24.

50.     The Court finds that section 10.2.3 affects the "measure of recovery" because it simply precludes HPS's recovery when HPS is negligent or otherwise responsible for an interruption in Subcontract work.  Consequently, HPS is not entitled to recover the cost of installing the valves out of sequence under the Miller Act.

### iii.     Acceleration (PCO 9)

51.     HPS seeks damages in the amount of $21,456 for costs of accelerating its work in August of 2008 to meet the milestone deadline of August 22, 2008.[5]

52.     JMR directed HPS to have its crew work overtime and on weekends.  Sloss, Tr. 26; Pourroy, Tr. 323; Morrill, Tr. 509.  The contemporaneous evidence shows that at the time, JMR acknowledged having ordered HPS to work an accelerated schedule.  *See* Exhs. 751, 811, 864, 949.

53.     Nevertheless, JMR was entitled to accelerate HPS's work under section 6.3 of the Subcontract, which provides:

> Whenever, *in the Contractor's opinion*, the Subcontractor fails to

also included profit and overhead.  Without the 20 couplings, and deleting profit and overhead, the change order is $21,914.26.  Including 10% profit and overhead raises the total claim to $24,105.69."  HPS Br. at 18.
        [5] HPS originally sought $69,075 through the claim associated with PCO 9, but now admits that the "original change order request for acceleration costs erroneously included the base wages in the calculation."  HPS Br. at 23; *see also* Exh. 607; Exh. 593.

United States District Court
Northern District of California

1

> maintain its part of the Schedule of Work, the Contractor may direct the Subcontractor to take all steps, *such as overtime or shift work*, until the Subcontract Work is in accordance with such Schedule. *Such steps shall be without additional cost or compensation from the Contractor.*

2

3

4  Subcontract, Exh. 328 at 15 (emphasis added).  The Court finds that section 6.3 of the Subcontract

5  affects the "measure of recovery" under the Miller Act because it simply precludes HPS's

6  recovery for costs of acceleration when HPS has fallen behind its schedule of work.

7  54.     HPS was responsible for the delay prior to the August 22, 2008 milestone deadline.

8  Even without installing the valves and laterals in the first phase of the Project, HPS was unable to

9  complete installation of the full length of the mainline by August 22, 2008.  Sloss, Tr. 25.  This

10  was largely due to HPS's safety violations, failed compaction tests, and failure to pothole to avoid

11  obstructions.

12  55.     The Court rejects HPS's contention that it was unreasonable for JMR to accelerate

13  HPS's work when, due to the delayed delivery of the valves, it was impossible to meet the August

14  22, 2008 milestone deadline.  Complete installation of the valves and laterals by August 22, 2008

15  was a contractual obligation to which JMR and HPS were bound notwithstanding the delayed

16  delivery of the valves.  *See* Figgness, Tr. 576-77.

17  56.     Moreover, even though HPS could not install the valves and laterals by August 22,

18  2008, it was still important to complete installation of the mainline by August 22, 2008.  The

19  encroachment permit allowed HPS to work with a permanent lane closure on Bollinger Canyon

20  Road until the permit's expiration on August 22, 2008.  Peterson, Tr. 218.  After August 22, 2008,

21  the lane closure needed to be opened to ease traffic congestion at the start of the school year.

22  Morrill, Tr. 508.  While installation of the mainline required a permanent lane closure, "the

23  laterals and the valves and the T's, … [by] contrast, could be isolated."  Figgness, Tr. 576.

24  **iv.     Directional Drilling (PCO 24)**

25  57.     HPS seeks damages for the additional costs associated with installing the pipeline

26  in the intersections by using the direct drilling method as opposed to the open cut method.

27  58.     JMR contends this claim fails for the same reason as the acceleration claim.

28  Section 6.3 allows JMR to "direct the Subcontractor to take *all steps, such as overtime or shift*

*work*," to accelerate HPS's work if HPS is behind schedule.  Exhibit 328 at 15 (emphasis added).

JMR contends that section 6.3 authorizes JMR to direct HPS to use the directional drilling method

in lieu of the open cut method.

59.  JMR's interpretation of section 6.3 is supported by the words "all steps," which can

be broadly construed to cover methods of construction, such as directional drilling or open cut.

However, the words "all steps" is further defined by the subsequent phrase, "such as overtime or

shift work," which implies that "all steps" should be interpreted more narrowly.

60.  The Court ultimately need not decide whether section 6.3 of the Subcontract

authorizes JMR to direct HPS to use the direct drilling method if HPS is behind on its schedule of

work.  HPS's claim for directional drilling fails for other reasons.

61.  HPS initially sought $79,616 for the additional costs incurred while using the

directional drilling method, submitted as PCO 24.  *See* Exh. 582.  This amount was based on

HPS's estimation that it would have cost $39.24 per foot to do open cut installation in the

intersections.  Pourroy, Tr. at 309.  This estimate applied to the entire pipeline, without

differentiation between the cost of installing the Pipeline inside and outside of the intersections.

*Id*.

62.  In his expert report, John Morrill wrote that the average cost per foot of installing

the Pipeline in the intersections would be greater than the average cost per foot of installing the

entire pipeline because there are more obstructions in the intersections.  *See* Morrill, Tr. 523, 542-

43; Morrill Expert Report, Exh. 291 at 12-14.  HPS has now conceded this point, and has noted

that its $39.24 figure underestimated the average cost per foot of open cut installation in the

intersections, which resulted in an overestimate of this claim.  Pourroy, Tr. at 309; HPS Br. at 19.

63.  HPS states that it re-calculated the price per foot of open cut installation to equal

$59 instead of $39.24.  Pourroy, Tr. at 309.  HPS's re-calculation decreases the total amount

sought in HPS's directional drilling claim, but it is unclear by how much.  *See id.*  During trial,

HPS represented that the directional drilling claim was reduced to $52,413.  *See* Exh. 1037.  In

HPS's post-trial briefing, HPS represents that the direct drilling claim has been reduced to

$48,000.  *See* HPS Br. at 19.  Trial Exhibit 612, which is supposedly an in-house estimate of the

1  direct drilling claim prepared in December of 2013, does not contain either of these numbers.  *See*

2  Pourroy, Tr. 309-12; Exh. 612.

3       64.  Nor does HPS explain how it arrived at the $59 figure.  *See* Pourroy, Tr. 309:12.

4  While HPS states that Exhibit 612 reflects HPS's final estimation of the cost of open cut

5  installation in the intersections, the actual text of Exhibit 612 does not even appear relevant to this

6  analysis, and certainly does not support HPS arriving at the $59 figure.  *See* Pourroy, Tr. 309-12.

7       65.  Absent any explanation regarding how HPS arrived at the new $59 figure, the

8  Court cannot determine whether HPS used a reasonable method to estimate these damages.  There

9  is no indication that, in a previous project, HPS ever used the open cut method in an intersection,

10  such that HPS was able to estimate the cost for this Project.  Rather, the $59 figure seems to be

11  derived by simply adding $20 per cubic foot to the first $39 estimation.

12       66.  JMR has also submitted more detailed estimations showing that HPS would not

13  have incurred any additional cost by using the directional drilling method.  Morrill Expert Report,

14  Exh. 291 at 15-16.  Accordingly, without any factual basis in support of HPS's estimation that it

15  incurred an additional $59 per cubic foot for using the direct drilling method, the Court finds that

16  HPS is not entitled to damages for direct drilling.

17       **v.**  **Installation of Steel Offsets at Chanterella (PCO 44)**

18       67.  HPS seeks $8,841 in damages associated with the USACE's requirement that HPS

19  install steel offsets at the Chanterella intersection.  *See* Exh. 594.  HPS states that East Bay MUD

20  demanded that steel offsets be used, Jones, Tr. 60-61, and that the USACE should have issued a

21  change order because the contract documents do not require HPS to use steel piping in that

22  location.

23       68.  The contemporaneous evidence shows that in 2009, JMR took the same position as

24  HPS.  On several occasions, JMR wrote in its daily quality control report that, "We are proceeding

25  under protest as this work was called for by changed EBMUD drawing that was not part of the

26  contract and not detailed to be steel…."  *See e.g.*, Exh. 476 at Report No. 460.

27       69.  This evidence shows that the requirement that steel offsets be used in the

28  Chanterella intersection was a change in the contract's scope of work.  JMR does not dispute this.

United States District Court
Northern District of California

1    70.    Rather, JMR now takes the same position the USACE took in the REA

2 negotiations—that HPS created the circumstances for this change by using the direct drilling

3 method.  When JMR/HPS initially submitted the Request for Information No. 32, requesting

4 direction on the piping requirements due to constraints in existing conditions relating to shoring

5 difficulties, the USACE approved East Bay MUD's requested change and requested a cost

6 proposal from JMR/HPS.  *See* Morrill Expert Report, Exh. 291 at 20-21.  However, JMR states

7 that upon further evaluation of the condition, the USACE ultimately withdrew its cost proposal

8 after concluding that HPS chose to use the direct drilling method, which changed the Pipeline's

9 elevation in the Chanterella intersection and created the need for the steel offsets.  *See id.*

10    71.    Section 4.18.1 of the Subcontract states:

11       If the Contractor or some other entity for which the Subcontractor *is
         not responsible* caused the nonconforming condition, and the
12       Subcontractor was unaware of this condition when the work was
         covered, the Contractor shall be required to adjust this Agreement
13       by change order for all such costs and time.

14 Subcontract, Exh. 328 at 10.  Thus, HPS must show that it was not responsible for creating the

15 circumstances (i.e. directional drilling) that required steel offsets to be used in the first place.

16    72.    The Court finds the evidence inconclusive as to whether JMR required HPS to use

17 the direct drilling method.  Irwin's expert report cast doubt on HPS's position that this was

18 required by JMR.  *See* Irwin Expert Report, Exh. 623 ("HPS along *with the concurrence of JMR*

19 engaged a subcontractor Wellco to install the pipe through the three intersections using directional

20 drilling.") (emphasis added).

21    73.    Nevertheless, even if JMR did compel HPS to use the direct drilling method, HPS

22 has not met its burden to show that it was *not responsible* for the need to use the direct drilling

23 method.  HPS was behind its schedule of work and had not submitted any shoring submittals,

24 which would have been required to use the open cut method in the intersections.  Shoring

25 submittals would have taken approximately one month for the USACE to approve, delaying

26 HPS's progress even further.  Accordingly, the Court finds HPS partly responsible for creating the

27 conditions that required use of the direct drilling method.

28    74.    In light of the uncontroverted evidence that USACE believed the use of the direct

United States District Court
Northern District of California

United States District Court
Northern District of California

1   drilling method created the circumstances that required steel offsets to be used at the Chanterella

2   intersection, *see* Morrill Expert Report, Exh. 291 at 20-21, the Court finds that HPS has not shown

3   that it was not responsible for creating the circumstances that necessitated PCO 44.

4           **vi.     Reinstallation of Steel Offset at Chanterella Intersection (PCO 51)**

5           75.     HPS seeks $4,132 in damages associated with having to re-install one of the steel

6   offsets on or around September 3, 2009.  *See* Exh. 587.  The evidence shows that HPS

7   encountered a pipe that supplied a fire hydrant at the same elevation where the steel offset was

8   depicted on the plans.  Jones, Tr. 63.  While the hydrant pipe was marked the plans, "[t]he

9   elevation [of the hydrant pipe] wasn't on the plans."  *Id*.; *see also* Exh. 476 at Report No. 475

10  (daily report for September 3, 2009 states, "The pipe feeding the fire hydrant was at a different

11  elevation then shown on the profile on contract drawing.").  Thus, HPS had to re-install the steel

12  offset at a different elevation.  *Id*.

13          76.     JMR has presented evidence that obstructions are often not marked in their exact

14  locations, and that the standard practice is for an excavation crew to first locate the exact location

15  of any obstruction by potholing prior to excavation.  Figgness, Tr. 580-81.  Moreover, Section 4.3

16  of the Subcontract requires HPS to "become fully acquainted with the nature and location of the

17  Subcontract Work," including "obstructions."  Subcontract, Exh. 328 at 6.

18          77.     HPS also admitted that it did not pothole prior to commencing the work around the

19  hydrant pipe.  Jones Tr., 80.  Accordingly, the Court finds that the additional costs HPS incurred

20  as reflected in PCO 51 were a result of HPS's own performance.  This cost is not recoverable

21  under the Miller Act payment bond.

22          **vii.    Installation of a Test Plate (PCO 53)**

23          78.     HPS seeks $11,859 in damages associated with the cost of installing a test plate on

24  an existing valve that was not installed by HPS.  Jones, Tr. 52; *see also* Exh. 588.  HPS's

25  superintendent, Mike Jones, testified that he and two other HPS employees worked 30 hours each

26  to install the test plate, and used the equipment as reflected in PCO 53.  *See* Jones, Tr. 52-53; Exh.

27  588.  On cross-examination, JMR did not ask Jones any question pertaining to the test plate.

28          79.     JMR now contends that PCO 53 was rejected by the USACE because HPS failed to

substantiate its costs and hours reflected in PCO 53 with additional evidence.  While Morrill writes in his expert report that HPS failed to provide sufficient information supporting this PCO, JMR presented no evidence at trial to dispute Jones's testimony that costs reflected in PCO 53 accurately depict the cost of providing materials and labor to install the test plate.  Therefore, JMR's contention that these costs are not substantiated is without merit.

80.    Further, the Court finds that the costs included in PCO 53 reflect the cost of HPS's provision of "labor and material in carrying out the work provided for in the contract…." 40 U.S.C. § 3131(b)(2); *see* Jones, Tr. 52.  Accordingly, GAIC is liable for the full amount of PCO 53 equal to $11,859.

**viii.    Total HPS Claims Recoverable (Before Offset)**

81.    In sum, without consideration of any offset based on JMR's counterclaim, Defendants JMR and GAIC are jointly and severally liable to HPS for the uncontested balance due, which is equal to $332,435.72.  GAIC is also liable to HPS for PCO 53 in the amount of $11,859.  Any amount awarded on JMR's counterclaim will be offset against these amounts combined, which is equal to $344,294.72.  *See Bartec Indus.*, 976 F.2d at 1278.

**D.    JMR's Claims**

**i.    Delay Claim**

82.    JMR seeks $341,062 for delay, which is the amount JMR contends USACE would have compensated JMR but for HPS's defective work causing delays.  As discussed above, the entire Project was delayed by 459 days.  PNM, Exh. 539.  During the REA negotiations, USACE agreed to compensate JMR for 320 days of delay.  That leaves a difference of 139 delay days for which JMR was not compensated by the USACE because they were deemed concurrent delays. *See id.*  JMR contends that HPS should pay for the delay associated with the remaining 139 days because HPS was responsible for causing that delay.  JMR Reply Br. at 3 ("*But for* the defective pipeline product HPS put in the ground, JMR would have received compensation for all 459 days of delay from the [USACE].") (emphasis added).

83.    Gerardo Prado, a USACE representative who was present at the REA negotiation, could not recall the reason why JMR was not compensated for the remaining 139 days.  Testimony

United States District Court
Northern District of California

of Gerardo Prado ("Prado"), Tr. 293.  The PNM drafted by the USACE does not refer to the delays associated with the Pipeline at all, but rather states that JMR conceded that it had delayed the Project through its shoring submittals:

> JMR did not make any significant concessions until the 17 July meeting when they stated that *they had not met the specified shoring requirements* of a contiguous pile system until the third of four submittals which was submitted on 5 December 2008.  Per the Government analysis there was no float remaining in JMR's schedule for the shoring approval as of 1 October 2008.  At the 17 July meeting JMR agreed to reduce their request for extended delay *from 459 days to 365 days.*

PNM, Exh. 539 (emphasis added).  While the PNM does not conclusively establish that JMR's inadequate shoring submittals caused the bulk of delay, it certainly discredits JMR's argument that the USACE believed HPS was the sole cause of concurrent delay.

84.     In any event, JMR's agreement to reduce its request for compensation from USACE, and its settlement with USACE, is not a proper basis to claim delay damages, and JMR recognizes as much.  JMR's main argument is that the Pipeline went on the critical path on December 23, 2009, and that HPS's testing of the Pipeline delayed the Project by the 155 days between December 23, 2009 and May 26, 2010, when the testing on the Pipeline alone was complete.  Prior to discussing JMR's delay claim and the critical path analysis proffered by Mr. John Elmer, the Court reviews the basic principles relating to the critical path method.

### *The Critical Path Method*

85.     The critical path method ("CPM") is a tool for scheduling and coordinating separate components in a construction project, and is useful in analyzing the extent and duration of time impacts attributable to many different causes.  *See* 5 Bruner & O'Connor on Construction Law § 15:6 (2014).  The theoretical advantages of the CPM are described by the United States Court of Claims in *Haney v. United States*:

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous inter-related separate small projects.  Each sub project is identified and classified as to the duration and precedence of the work (e.g., one would not carpet an area until the flooring is down and the flooring

1
2
3
4
5
6

> cannot be completed until the underlying electrical and telephone conduits are installed). The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many sub projects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise the entire project will delayed. These latter items of work are on the "critical path." A delay, or acceleration, to work along the critical path will affect the entire project.

7

*Haney v. U. S.*, 230 Ct. Cl. 148, 676 F.2d 584, 595, 30 Cont. Cas. Fed. (CCH) ¶ 70189 (1982).

8      86.    A CPM schedule is created by identifying the activities which must be performed

9  for the project, estimating the duration for each of those activities, and determining the sequential

10 relationships or "logic" necessary to establish the most efficient sequence of activities to complete

11 the project. 5 Bruner & O'Connor Construction Law § 15:8. Then, a "baseline" schedule using

12 CPM network logic may be prepared using a computer scheduling program. *Id.* The baseline

13 schedule "reflects the earliest dates by which each activity can be started and finished based on the

14 logical ordering, sequencing and estimated duration of each activity." *Id.* "By finding the longest

15 continuous chain of interdependent activities running through the project, one can identify both

16 the project's critical path and the planned estimated completion date." *Id.*

17      87.    "The time difference between the early start and late start or the early finish and

18 late finish of each activity is 'float,' that is, the time that the start of the activity can be delayed

19 without affecting the critical path and timely completion of the project." *Id.* In other words, the

20 total float for a given activity "represents the amount of scheduling discretion or flexibility that

21 may be available for that activity before its total project duration will be adversely affected." *Id.*

22 An activity with zero float is on the critical path. *Id.*

23      88.    A CPM that has been regularly updated to reflect a historical "as-built" record is

24 generally considered the "best evidence" of causation and duration of events impacting the critical

25 path. 5 Bruner & O'Connor Construction Law § 15:10. "Both causation and duration of such

26 events typically are addressed in the update 'narrative' documenting the reasons for scheduling

27 changes, and revised activity durations and sequences are reflected on the CPM itself." *Id.*

28 "Where a party pursuing or defending against a time impact claim relies, without more proof,

United States District Court
Northern District of California

41

upon an outdated CPM schedule for evidentiary proof of impact, the proof routinely is rejected." *Id*.

89.     To determine which party is responsible for an impact on the critical path of a project, courts must consider which entity or entities had legal "control" over the activity which caused the impact.  5 Bruner & O'Connor Construction Law § 15:24.  Several factors influence whether an entity has "control," including the scope of a party's undertaking and allocation of risk in the contract, a party's fault or negligence in the performance of its contractual duties, and in the case of the non-breaching party, the party's ability to reasonably mitigate damages.  5 Bruner & O'Connor Construction Law § 15:25; *see also Titan Pacific Const. Corp. v. U.S.*, 17 Cl. Ct. 630, 1989 WL 78828 (1989), *aff'd*, 899 F.2d 1227 (Fed. Cir. 1990)).

90.     "Concurrent delay" is delay to the critical path caused concurrently by multiple events not exclusively within the "control" of one party.  5 Bruner & O'Connor Construction Law § 15:29.  When there is concurrent delay, the remedy is usually limited to a time extension. *Id*. This is because to receive compensation for delay, "the party seeking damages for delay must prove that delay to the critical path would not have occurred 'but for' an event within the 'control' of the other party."  *Id*.

91.     To determine whether there is "concurrent delay," one must analyze the impact of each cause of delay on the critical path.  "Delay of noncritical activity, which by definition cannot delay the critical path of the project, cannot be a 'concurrent' cause of project delay."  5 Bruner & O'Connor Construction Law § 15:68.  However, there may be multiple events causing critical path delays.  "The crucial issue for analysis is whether the critical path activity could have proceeded 'but for' only one or more delaying event."  *Id*.

92.      "Recovery of damages by either contracting party requires proof that the other party 'controlled' a time impacting event that was the *sole cause* of the damages….  The crucial battleground in time impact litigation is the determination of *causation*, measurement of *duration* and proof of '*control*.'  "  5 Bruner & O'Connor Construction Law § 15:120 (emphasis added).

93.     "Proof of a specific cause and effect relationship between occurrence of an event and time impact to the critical path is essential … for validating time impact claims or defenses."

42

United States District Court
Northern District of California

5 Bruner & O'Connor Construction Law § 15:124.  The starting point for the analysis is the baseline schedule that has been properly and frequently updated.  *Id*.  Contemporaneous evidence should also be used to determine the causes and impacts of actual delays to the project.  *Id*.  "Moreover, any analysis that fails to take into consideration the effect of *all delays* to the critical path will be rejected."  *Id*. (emphasis added).

*Analysis of JMR's Delay Claim*

94.     JMR contends the Pipeline went on the critical path on December 23, 2009, the day the Pump Station was ready to be tested with the Pipeline.  JMR presented evidence that the Pump Station was substantially finished and ready for testing on December 23, 2009.  Elmer Expert Report, Exh. 244; Morrill, Tr. at 549-50.  JMR also presented evidence that HPS did not finish its testing of the Pipeline until May 26, 2010.  *Id*.  JMR states that HPS's delayed testing of the Pipeline delayed the entire Project by 155 days, which reflects the number of days between December 23, 2009 and May 26, 2010.  *Id*.

95.     HPS contends that at all times the critical path went through the Pump Station and never went through the Pipeline.  Irwin Expert Report, Exh. 623, Exh. A at 9; Irwin, Tr. 363.  HPS states that the critical path is measured by the longest path of construction, and contends that because the Pump Station had a longer path of construction than the Pipeline, the critical path only went through the Pump Station.  This is the same position JMR took when JMR submitted its REA to the USACE.  *See* JMR REA, Exh. 523.

96.     In the REA, JMR's expert John Elmer wrote that USACE was responsible for all 459 days of delay because "the Pipeline impacts were not critical and therefore did not control nor dictate the delay to the Project Completion."  JMR REA, B.5, Exh. 523 at 7.  Rather, JMR's REA attributed the cause of all delay to the Project to the construction of the Pump Station.  JMR wrote:

> The causes [of project delay], though varied, resulted from 4 main issues that controlled much of the work at Pump Station.  Those issues are: 1) USACE untimely approval of the Pump Station shoring design; 2) USACE untimely change in Pump Station concrete waterproofing; 3) USACE directed change to the relocation of the Repeater Station, and redesign of the discharge pipe flow meter coupler/restraints both of which impacted completing the Pump Station work; and 4) USACE untimely approval and directed

43

United States District Court
Northern District of California

1    changes to JMR's Pump Station Start Up and Testing Plan.

2    JMR REA, A. Executive Summary, Exh. 523 at 1.  Notably, there is no mention of the Pipeline

3    causing critical path delay.

4          97.     JMR explains that in 2010, JMR finally understood why the USACE believed the

5    Pipeline was on the critical path.  *See* Morrill Rebuttal Report, Exh. 293.  Specification 01660 was

6    missing from the contract documents, and Specification 01660 clarifies that to finish the Project,

7    the Pipeline and the Pump Station must be tested together.  Morrill explains:

8              These specification [sic] were used on the previous R200B-R300
               sister project to this project.  Suffice it to say, had this missing
9              specification been incorporated as intended in the above #4 Testing
               Specifications the Corps 7-day system operation test for the entire
10             plant would have been easily resolved much sooner than later.
               Clearly the inclusion of the missing specification 01660 defines the
11             pump station and pipeline system 7-day operational and
               commissioning testing versus the component testing requirements
12             that were incorporated into the Project specifications for the existing
               project.
13

14   Morrill Rebuttal Report, Exh. 293 at 14.  This may explain why JMR took to contrary position in

15   the REA than it does in this lawsuit.

16         98.     The incorporation of Specification 01660 casts doubt on HPS's critical path

17   analysis, which assumes that the Pump Station and the Pipeline did not need to be tested together.

18   *See* Irwin Expert Report, Exh. 623 at 12 (noting that in both the baseline schedule and the "as-

19   built" schedule, "the Pump Station and the Pipeline were treated as two separate projects" and the

20   Pump Station at all times had the longest path to completion).  In 2010, USACE issued a change

21   order incorporating Specification 01660 into the contract documents, which shows that the Pump

22   Station and Pipeline had to be tested together.  Morrill Expert Report, Exh. 293 at 14.  Thus, the

23   fact the Pump Station had a later completion date than the Pipeline does not show that Pipeline

24   was never on the critical path.  Rather, because of the 7-day dual test, any event that delayed the

25   Pipeline beyond the date in which the Pump Station was ready for the 7-day test would be on the

26   critical path.

27         99.     The CPM analysis JMR presented to this Court is not any more persuasive than

28   HPS's.  *See* Elmer Expert Report, Exh. 244; *see also* Exh. 285 (Elmer Rebuttal Report).  Elmer's

44

United States District Court
Northern District of California

1   report consists of a cursory analysis and a graph comparing the as-built schedule to an earlier

2   schedule.  *See id.*  The graph shows that the Pump Station was ready to be tested on December 23,

3   2009, and that HPS completed testing of the Pipeline on May 26, 2010.  *Id.* at 9.

4        100.    The conclusory nature of Elmer's CPM analysis is most striking when compared to

5   the CPM analysis Elmer drafted for JMR's REA.  There, Elmer considered eleven schedules,

6   including the baseline schedule and ten updates throughout the course of the Project (SR01 -

7   SR10), to evaluate all of the delays to the critical path of the Project.  JMR REA, Exh. 523, Exh.

8   1.1 (Project Delay Analysis).  Elmer introduces his CPM analysis contained in the REA as

9   follows:

10          The [CPM] analysis provides a reiteration of the Contract schedule
        requirements, methodology used for determining project delays,

11          detail chronicle of what JMR considers the most significant schedule
        impacts affecting the project, and a monthly chronology of the

12          project including progress status and identified delays or gains based
        on the contemporaneous Project Schedule Updates.  In addition to

13          the monthly narratives, corresponding schedule graphic have been
        provided comparing each month planned and actual work as a basis

14          for the delays and/or gains as they occurred during the project.

15  *Id*. at 1-2.  The type of CPM analysis Elmer included in the REA, which included an in-depth

16  analysis of the causes at each of the regular updates, is generally considered to be the "best

17  evidence" of causation and duration of events impacting time during construction.  *See* 5 Bruner &

18  O'Connor Construction Law § 15:10.  The CPM analysis JMR submitted in this case will not be

19  accorded the same weight.

20       101.    The CPM analysis JMR submitted in this case does not show that the Pipeline was

21  actually on the critical path as of December 23, 2009.  *See generally*, Elmer Expert Report, Exh.

22  244; Morrill Rebuttal Report, Exh. 293.  The evidence shows that only the final 7-day test required

23  both the Pipeline and Pump Station to be tested together.  Morrill Rebuttal Report, Exh. 293 at 9,

24  13.  Three other tests for the Pump Station were required to precede this final 7-day test.  *Id*. at 9.

25  JMR's submittals for these three tests were not approved by USACE until March 9, 2010.  *Id*. at 8.

26  This suggests that the 7-day dual test could not have occurred until sometime after the other tests

27  had been approved on March 9, 2010, and then completed.  JMR has not explained why, as of

28  December 23, 2009, the Pipeline was on the critical path if the Pump Station was not ready for the

1    7-day test.

2        102.     Elmer's CPM analysis also does not discuss whether there was any concurrent

3 delay between December 23, 2009 and May 26, 2010. Even assuming the Pump Station was

4 ready for the 7-day dual test on December 23, 2009, that does not prove the Pipeline was the "but

5 for" cause of critical path delay to May 26, 2010. *See* 5 Bruner & O'Connor Construction Law §

6 15:120. If the delayed testing of the Pipeline were indeed the sole cause of this critical path delay,

7 then one would presume that immediately after HPS finished testing the Pipeline on May 26,

8 2010, JMR would have conducted the dual test of the Pipeline and Pump Station. That is not what

9 happened. JMR did not commence the final 7-day dual test of the Pipeline and Pump Station until

10 August 2, 2010, the same day the USACE approved the submittals for this last test. Irwin Expert

11 Report, Exh. 623 at 19.

12        103.     JMR states that the USACE was solely responsible for the delay between May

13 2010 and August 2010. Elmer Expert Report, Exh. 244 at 4. This may be true. Nevertheless,

14 even assuming the USACE is exclusively responsible for the delay after May 26, 2010, JMR must

15 still show that JMR and/or USACE was not in control of any events causing concurrent delay

16 prior to May 26, 2010.

17        104.     The evidence shows that there were other events causing delay to the critical path

18 between December 23, 2009 and May 26, 2010. *See* Elmer Expert Report, Exh. 244 at 4 (noting

19 that the resumption of HPS's work in 2010 was dependent "upon several factors."). As noted

20 above, three of the four submittals for JMR's testing were approved on March 9, 2010. Irwin

21 Expert Report, Exh. 623 at 19; Morrill Expert Report, Exh. 291 at 8. Even if the approval of these

22 submittals on March 9, 2010 does not show that the Pipeline was not on the critical path as of

23 December 23, 2009, it still shows that there was concurrent delay.

24        105.     In addition to failing to address concurrent delay between December 23, 2009 and

25 May 26, 2010, Elmer's CPM analysis fails to address whether HPS was in exclusive control of the

26 fact it began testing the Pipeline so late in Project. In other words, Elmer's CPM analysis fails to

27 take into account whether any events prior to December 23, 2009 caused an impact on the critical

28 path after December 23, 2009. By only looking at events after December 23, 2009, JMR

1    improperly equates "critical path" to "causation."  However, these are two separate elements that

2    both must be considered when assessing liability for time impacts on the critical path.  5 Bruner &

3    Construction Law § 15:29.

4          106.    In addition to proving that HPS was exclusively responsible for critical path delay

5    and that there was no concurrent delay, JMR also must show that it gave HPS timely notice of the

6    delay claim. 5 Bruner & Construction Law § 15:121.  However, JMR concedes that JMR was not

7    even aware of the pertinent information which put the Pipeline on the critical path until June 2010,

8    after HPS had finished testing the Pipeline.  During the actual testing of the Pipeline, JMR

9    believed that the delay to the Pump Station caused by the Pipeline delay was "insignificant."

10   Elmer Expert Report, Exh. 244 at 4.  The USACE only later issued a change order incorporating

11   Specification 01660 into the Prime Contract.  *See* Morrill Reply Report, Exh. 293 at 8 ("[T]he

12   requirement of providing a 7-day operation system test of the entire pump station as a complete

13   unit, i.e., pipeline and pump station was a directed change and added to JMR's scope of testing per

14   the 6.1.2010 meeting between JMR and USACE.").

15         107.    The Court also finds that JMR has not presented evidence showing entitlement to

16   recover *Eichleay* damages.  The Court discussed *Eichleay* damages in the section above

17   addressing HPS's delay claim.  Like HPS, JMR must prove "effective suspension of much, if not

18   all, of work on the contract."  *P.J. Dick v. Principai*, 324 F.3d 1364, 1371 (Fed. Cir. 2001).

19              As long as the contractor is able to continue performing the contact,
20              although not in the same way or as efficiently or effectively as it had
                anticipated it could do so, it can allocate a portion of its indirect
21              costs to that contract and there is accordingly no occasion in that
                situation to resort to recovery under the *Eichleay* formula, which is
22              an extraordinary remedy.

23   *Charles G. Williams Constr. v. White*, 326 F.3d 1376, 1380 (Fed. Cir. 2003).  In other words, a

24   contractor cannot recover home office overhead simply because of a critical path delay if the

25   contractor was engaged in other work during the time period for which it seeks compensation.  *See*

26   *id.*

27         108.    JMR has not presented evidence that it was not engaged in any other work during

28   the period between December 23, 2009 and May 26, 2010.  JMR states that the costs and elements

United States District Court
Northern District of California

47

of the *Eichleay* damages were verified by an independent CPA and accepted by the USACE in the REA negotiations. *See* Messina Tr., 680; Exh. 314. While true, the fact the *Eichleay* damages were verified by a CPA does not show that JMR was unable to work during that time. Mr. Messina is an accountant who just calculated the numbers, and even testified that he had no opinion as to the import of the calculation. *See* Messina Tr., at 671.

109.    In any event, JMR has not submitted any evidence supporting its request for $341,062 in *Eichleay* damages for other reasons. Mr. Messina submitted a report calculating a daily rate of combined indirect field costs and extended overhead of $2,228.64. *See* Messina Report, Exh. 314 at 32. That report indicates that this daily rate should be multiplied by the 139 days of uncompensated delay, to arrive at a total damages figure of $309,780.37. *See id.* There is no explanation for how JMR arrived at the $341,062 damages figure.

110.    As a final point, JMR did not use a reasonable method to estimate the indirect field costs. The table displaying Mr. Messina's calculations of indirect field costs is incomprehensible. *See* Messina Report, Exh. 314 at 33. Mr. Messina testified that he "simply took the costs or the delay days that [he] was given for each of those short periods, and – and came up with a number. [He] didn't consider any details of the job outside of that." Messina Tr., at 672. However, merely taking an average of the field costs for the entire Project does not adequately estimate the extent of field costs during the period between December 23, 2009 and May 26, 2010. Indeed, Mr. Messina's report even shows that field costs differed among different time periods for the Project. *See* Messina Report, Exh. 314 at 33 (noting that field costs between May and December 2008 averaged at $802 per day and that field costs between January and October 2009 averaged at $1,135 per day). Thus, it was improper to estimate field costs pertaining to a specific period (December 23, 2009 to May 26, 2010) by averaging the field costs per day for the entire Project.

111.    Therefore, JMR shall recover nothing on its delay claim.

**ii.    Backcharge No. 1**

112.    A backcharge is issued when a general contractor incurs costs on behalf of one of his performing subcontractors, and then charges the subcontractor for the work. Figgness, Tr. 586.

113.    In Backcharge No. 1, JMR seeks $93,234.41 in damages associated with direct

1    costs JMR allegedly incurred as a result of HPS's failure to perform in accordance with the

2    subcontract.  Exh. 200 at 1.  These costs include: Dirt Haul Off Charges ($4,575); Asphalt Off

3    Haul Disposal Fee ($3,240); HPS Trucking Charges to JMR Account ($45,872.82); Compaction

4    Failure Re-Test ($3,914.58); Subcontractor Back Charges−Terra Construction ($10,604.96); and

5    Asphalt Paving Overages ($15,037.65).  *Id*.  JMR has also assessed a 12% markup on the subtotal

6    of $83,245.01 to yield $93,234.41 as the total amount allegedly owed.  *Id*.

7         114.    Before addressing each individual portion of Backcharge No. 1, the Court

8    addresses JMR's contention that prior to trial, HPS admitted that each of the charges comprising

9    Backcharge No. 1 were "valid backcharges."  *See* JMR Reply Br. at 9-11; *see* Exh. 209 at 2.  JMR

10   made this argument for the first time in its rebuttal brief, thereby depriving HPS of any

11   opportunity to respond.  The document on which JMR relies was never discussed at trial.  *See*

12   Exh. 209 at 2.  While the document reflects a list of "valid" backcharges and "disputed"

13   backcharges, the author of the document is not apparent from the document itself.  *See id.*  The

14   document is accompanied by a one-line cover letter (for which there is also no apparent author)

15   which states that the document is a letter from Kenny Pourroy to Les DenHerder.  *Id*. at 1.

16   However, JMR never questioned Mr. Pourroy nor Mr. DenHerder regarding this apparent

17   admission.  Accordingly, JMR has failed to prove that HPS ever admitted that Backcharge No. 1 is

18   comprised of "valid backcharges."

19         a.  *HPS Trucking Charges to JMR Account*:

20        115.    HPS concedes that it is liable to JMR for $45,872.82 incurred for trucking charges.

21   HPS Br. at 8; *see* Exh. 203.

22         b.  *Dirt Haul Off Charges*

23        116.    JMR seeks $4,575 for the extra cost JMR allegedly incurred for additional dirt or

24   "spoils" that needed to be hauled off from the Project.  *See* Exh. 201.  HPS excluded "Dirt

25   Disposal about 2580 [cubic yards]" in its bid.  HPS Bid, Exh. 212 at 4.  JMR relied on HPS and

26   estimated its own cost of hauling 2580 cubic yards in the bid it submitted to USACE.  Figgness,

27   Tr. 587-88.

28        117.    HPS contends that JMR was not entitled to rely on HPS's estimation of the amount

United States District Court
Northern District of California

United States District Court
Northern District of California

1  of material as if it were a guarantee. The Court disagrees.  If HPS had not excluded 2580 cubic

2  yards of dirt haul off in its original bid, HPS would have been responsible for hauling all the

3  material.  Figness Tr., 587-88.

4       118.    Section 3.1 of the Subcontract states that Subcontractor will "provide all labor,

5  materials equipment and services *necessary or incidental* to complete the part of the work which

6  the Contractor has contracted with the Owner…."  Subcontract, Exh. 328 at 5 (emphasis added).

7  The haul of dirt that is excavated is a service that is "necessary and incidental" to the installation

8  of the Pipeline.

9       119.    JMR initially bore the cost of hauling additional tons of dirt, and JMR is entitled to

10  be compensated for the additional amount that HPS did not estimate in its original bid.

11            *c.  Asphalt Haul Off Disposal Fee*

12       120.    JMR seeks $3,240 that it paid in fees to dispose of asphalt.  *See* Exh. 202.  HPS

13  notes that its bid excluded "All Permits and Fees," which HPS contends include asphalt disposal

14  fees.  *See* HPS Bid, Exh. 212 at 4.  This exclusion is also noted in Exhibit A to the Subcontract,

15  which governs HPS's scope of work.  *See* Subcontract, Exh. A at 31.  This "specific exclusion"

16  controls and nullifies the "general inclusion," which states that the Subcontract is responsible for

17  "[a]ll licenses, fees and permits associated with the Subcontractor's scope of work."  *See id.*

18       121.    JMR contends that the exclusion of "All Permits and Fees" on HPS's bid does not

19  refer to fees for asphalt disposal, but only to the fees JMR would be responsible for paying under

20  the Prime Contract, such as the fee for the encroachment permit.

21       122.    HPS's bid included Specification 02300, and Specification 02300 was ultimately

22  included in HPS's scope of work in the Subcontract.  *See* HPS Bid, Exh. 212; Subcontract, Exh.

23  328 at 31.  Section 3.09 of Specification 02300, entitled "Disposal of Materials," provides in

24  subsection (C): "Material which is unsuitable for fill, including rock, cemented materials,

25  boulders, broken concrete, *asphalt and other materials, shall be removed and disposed of at the*

26  *Contractor's expense at a waste* disposal or landfill site conforming to all local, State and Federal

27  regulations." Exh. 412 at (emphasis added).  Because HPS's bid included Specification 02300,

28  HPS was responsible for the expense of the asphalt disposal.

123. HPS notes that Specification 02220, which pertains to selective site demolition and includes all asphalt demolition on the Project, was *not* included in HPS's bid. *See* HPS Bid, Exh. 212; DenHerder Tr. 685; Exh. 410 (Specification 02220). Nor was it included in HPS's scope of work on the Subcontract. Nevertheless, JMR does not seek the costs of asphalt *demolition* through this portion of Backcharge 1. Rather, JMR seeks to recover the expense of asphalt *disposal*, which HPS was responsible to pay for pursuant to the Subcontract and Specification 02300.

### d. *Compaction Failure RE-Test:*

124. JMR seeks $3,914.58 for JMR's additional costs associated with HPS's failed compaction tests in the summer of 2008. *See* Exh. 204. HPS's bid specifically excluded "Compaction Test." HPS Bid, Exh. 212 at 4. "Compaction Test" is also excluded from HPS's scope of work in the Subcontract. Subcontract, Exh. A at 31. Nevertheless, JMR contends that the cost of HPS's 47 failed compaction tests should be borne by HPS because a re-test had to be conducted in each case as a result of HPS's poor compaction in the first instance. Figgness, Tr. 592.

125. JMR contends that the Subcontract makes HPS responsible for the costs of any failed test. The Court agrees. Section 4.18.2.1 of the Subcontract provides:

> If the Subcontract work is not in conformance with the Subcontract Documents, the Subcontractor shall promptly correct the Subcontract Work whether it had been fabricated, installed or completed. The Subcontractor shall be responsible for the costs of correcting such Subcontract Work, *any additional testing*, inspections, and compensation for services and expenses … made necessary by the defective Subcontract Work.

Subcontract, Exh. 328 at 11 (emphasis added).

126. In addition, section 1.04 of Specification 02300, entitled "Soil Testing/Quality Assurance," provides:

> If test results are unsatisfactory, all costs involved in correcting the deficiencies in compacted materials shall be borne by the Contractor without additional cost to the Government. *Costs of retesting* and reinspection required as a result of inadequate, insufficient, or incomplete work by the Contractor shall be deducted from the Contract amount.

United States District Court
Northern District of California

51

1    Exh. 278 at 392 (emphasis added).  As discussed above, HPS is responsible for the work described

2    in Specification 02300.  Accordingly, the Court finds HPS liable for the additional costs of the 47

3    failed compaction tests.

4                         *e.*  *Subcontractor Back Charges – Terra:*

5          127.    JMR seeks $10,604.96 for back charges related the additional costs incurred by

6    JMR to compensate one of the paving subcontractors, Terra Construction, through change orders

7    that were allegedly issued because of HPS's deficient work.  *See* Exh. 205.  Terra Construction

8    was responsible for placing a trench plate and/or asphalt over the aggregate base that was placed

9    by HPS after installing the pipe and backfilling the trench.  Figgness, Tr. 593.

10         128.    This portion of Backcharge No. 1 is the sum of the following back charges that

11    were issued by Terra Construction to JMR: (1) a portion of Terra Construction's fixed overhead

12    costs reflecting the lost productivity for Terra Construction when HPS's failed compaction tests on

13    August 4, 2008 ($782.46) and August 13, 2008 ($1,033.88); (2) labor and equipment use paid to

14    Terra Construction for working 1.5 hours to re-grade the aggregate base and place asphalt after

15    HPS discarded asphalt due to an oil spill in a previously paved trench patch ($1,147.20); (3) labor

16    and use of equipment paid to Terra Construction for regrading aggregate base that "was

17    substantially high and un-even" on August 20, 2008 ($940.51) and "unsuitable … due to the

18    elevation and smoothness" on August 21, 2008 ($1,626.34); (4) overtime wages paid to Terra

19    Construction employees working on Saturday, August 23, 2008 ($4,499.04); and (5) labor and

20    equipment use paid to Terra Construction for the time spent waiting for HPS to remove a plate

21    over a trench on August 28, 2008 ($575.53).  *See* Exh. 205.

22         129.    HPS contends that it is not liable for this portion of JMR's Backcharge No. 1

23    because JMR failed to establish that the grade was left low by HPS.  As shown above, only a

24    portion of this part of Backcharge No. 1 is based on HPS's allegedly poor grading.  In any event,

25    JMR presented evidence that in certain areas, the trench was left "8 or 9 inches deep, rather than 6,

26    which represents a 50 percent overrun…."  Figgness Tr. at 595.  JMR also submitted photographs

27    of a worker standing in a trench demonstrating with a ruler that the trench is 8 to 9 inches deep.

28    *See* Exh. 211 at 3-5.  There is also contemporaneous evidence in letters written by Terra

United States District Court
Northern District of California

52

1    Construction to JMR explaining how HPS's aggregate base was "un-even" and "unsuitable." Exh.

2    205 at 8, 10.  HPS has presented no evidence to controvert JMR's evidence of HPS's poor quality

3    grading.

4        130.    HPS specifically challenges the $4,499.04 paid to Terra Construction for its

5    employees to work overtime on Saturday, August 23, 2008.  *See* HPS Br. at 9; HPS Reply Br. at

6    17.  This claim is similar to HPS's acceleration claim, which the Court rejected because section

7    6.3 of the Subcontract authorizes JMR to direct HPS to accelerate if HPS falls behind schedule.

8    *See* Subcontract at 15.  As discussed above, HPS was behind on its schedule of work and did not

9    meet the August 22, 2008 milestone deadline.

10       131.    The Court finds that JMR is entitled to this portion of Backcharge No. 1, including

11   the charges for overtime performed by Terra Construction employees.  Section 4.18.2.1 of the

12   Subcontract states that HPS is responsible for the costs of JMR's additional compensation

13   obligations "made necessary" by HPS's "defective" work.  There is sufficient evidence that HPS's

14   defective work made Terra Construction incur additional costs.  Moreover, because HPS was

15   behind in its schedule of work, Terra Construction was also delayed.  The encroachment permit

16   from the City of San Ramon officially expired on Friday, August 22, 2008, and school would

17   commence the following week.  Therefore, it was "necessary" for JMR to pay for Terra

18   Construction employees to work on Saturday, August 23, 2008.

19       132.    However, JMR has not submitted evidence showing entitlement to the $1,147.20

20   back charge JMR paid to Terra Construction after its crew "discovered a substantial oil spill

21   within the previously paved trench patch" on August 15, 2008.  Exh. 205 at 6.  The spill covered

22   approximately 270 square feet.  *Id.*  The letter Terra Construction sent to JMR explains that "HPS

23   removed and off hauled the [asphalt] and our crews re-Graded the aggregate base and placed the

24   asphalt."  *Id.*  There is no indication from Terra Construction's letter, or any other evidence

25   submitted by JMR, that HPS was responsible for this oil spill.  *See id.*; Figgness, Tr. 593-94.

26   JMR's daily report for August 15, 2008 does not mention any oil spill.  *See* Exh. 476 at Report

27   No. 91.

28          f. *Asphalt Paving Overages*

133.   JMR also seeks $15,037.65 for asphalt paving overages, which reflect the cost of 92.8 tons of asphalt that were used in excess of the contract amount. *See* Exh. 206.  HPS contends that JMR failed to show that this asphalt was used to correct grading that was left too low by HPS.  HPS Br. at 9.  As mentioned above, however, JMR presented testimony, photographs and contemporaneous evidence attesting to HPS's low and poor-quality grading in certain areas. *See* Figgness Tr. at 595; Exh. 211 at 3-5; Exh. 205.  This evidence is uncontroverted.

134.   Nevertheless, JMR's evidence on this portion of Backcharge No. 1 is inadequate.  JMR only presented testimony from Gareth Figgness that Exh. 200 is an "accurate" summary of the charges comprising Backcharge No. 1, and that the "back up" substantiating these charges is depicted in Exhs. 202 to 216.  The "back up" for the charge for asphalt paving overages is Exhibit 206, which consists of a single page document that calculates an asphalt overage of 92.825 tons, which, at $162 per ton, purportedly cost JMR an additional $15,037.65.  There are no invoices showing that JMR actually paid this additional amount to an asphalt supplier.  There are no letters from Terra Construction accompanying a back charge submitted to JMR for this additional asphalt.  There is no testimony attesting to the method used to calculate the asphalt overage, or to the accuracy of the amount of this portion of Backcharge No. 1.  Aside from JMR's conclusory evidence showing that HPS did not always leave the aggregate base at the correct grade, there is not any evidence explaining the $15,037.65 charge for asphalt paving overages.

\* \* \*

135.   Accordingly, the Court finds that JMR is entitled to recover the *costs* reflected in Backcharge No. 1 ($83,245.01), less the costs associated with the Terra Construction's additional work resulting from the oil spill in the previously patched trench plate ($1,147.20), less the purported costs of paving overages ($15,037.65), for a total of $67,060.16.

136.   JMR has not proven entitlement to the 12% markup on Backcharge No. 1.  At trial, Gareth Figgness, who prepared Backcharge No. 1, testified that he "believed that was the markup stipulated in the subcontract agreement or changed work or back-charged work.  I believe it was 12 percent, and that's why it's 12 percent."  Figgness, Tr. 595-96.  JMR has not cited on contractual provision that entitled it to a 12% markup.  Accordingly, JMR is not entitled to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    12% markup.

2    137.    Therefore, HPS is liable to Defendants for $67,060.16 on Backcharge No. 1,

3    consisting of Dirt Haul Off Charges ($4,575); Asphalt Off Haul Disposal Fee ($3,240); HPS

4    Trucking Charges to JMR Account ($45,872.82); Compaction Failure Re-Test ($3,914.58); and

5    Subcontractor Back Charges−Terra Construction ($9,457.76).

6           **iii.    Backcharge No. 2**

7    138.    In Backcharge No. 2, JMR seeks to recover $308,282.62, which is the amount JMR

8    contends represents all of the direct costs for testing, traffic control and paving JMR incurred after

9    August 22, 2008.  JMR contends these damages were incurred as a result of HPS's failure to

10   complete installation of the Pipeline by August 22, 2008, and HPS's installation of defective

11   piping that required extensive testing and repair in 2009 and 2010.  *See* Exh. 217.

12   139.    Backcharge No. 2 also includes a 12% markup equal to $33,030.28, which is not

13   warranted for the reason discussed above.  Accordingly, JMR can at most recover $275,252.34

14   through Backcharge No. 2.  *See* Exh. 217.

15   140.    Whether JMR can recover this amount depends on whether JMR can prove that

16   HPS is the proximate cause of the damages contained therein.  *See* Cal. Civ. Code § 3300.

17   Backcharge No. 2 contains all of the costs JMR incurred for testing, traffic control and paving

18   between August 22, 2008 and June 6, 2010.  Under the contract documents, JMR was responsible

19   for testing, traffic control and paving.  Defendants nonetheless seek to show that JMR incurred

20   additional costs for these tasks because of HPS's breach of the August 22, 2008 milestone

21   deadline, and HPS's installation of defective piping, which required extensive testing and repair.

22   141.    The Court agrees that JMR may recover additional costs incurred for traffic control,

23   testing and paving as a proximate result of HPS's defective work or other events within HPS's

24   exclusive control.  This is required by Section 4.18.2.1 of the Subcontract.  *See* Exh. 328 at 11

25   (The Subcontractor shall be responsible for the costs of … the Contractor *made necessary* by the

26   defective Subcontract Work.") (emphasis added).  Nevertheless, JMR has made no attempt to

27   prove that each charge or even each group of charges contained in Backcharge No. 2 was

28   proximately caused by an event within HPS's control.

142.     Despite the fact Backcharge No. 2 comprises a high portion of the total amount of JMR's counterclaim, JMR has presented very little evidence on this issue.  Unlike the charges in Backcharge No. 1, there is no analysis describing why each category of cost was incurred.  The Vice President of JMR, Ron Rivard, testified in an extremely conclusory manner that all of the damages in Backcharge No. 2 were the result of HPS breach of the milestone deadline and installation of defective piping.  Rivard, Tr. 612-15, 632.

143.     HPS is responsible for the additional costs JMR incurred as a result of the leaks in the Pipeline, which required HPS to perform extensive testing and repair.  However, it is undisputed that no leak was discovered in the Pipeline until HPS began testing in September 2009.  Morrill, Tr. 496.  Thus, none of the costs incurred prior to September 2009 were a result of the leaks in the Pipeline.

144.     HPS is also responsible for the additional costs JMR incurred having to install the laterals and valves out of sequence.  Nevertheless, JMR makes no effort to show that all of the costs incurred prior to September 2009 were caused by the late delivery of the valves.  The evidence only indicates when the charge was incurred and for what (i.e., testing, traffic control or paving).  *See* Exhs. 218-42.  There is no evidence from which the Court can discern *why* these charges were incurred.

145.     In fact, JMR includes charges from September 2008 to December 2008, which is prior to the time HPS ever installed the laterals and valves.  *See* Exhs. 217-22.  Three of the four categories of charges were for traffic control after August 22, 2008, after HPS had stopped work on the Project.  *See id*.  JMR has presented no evidence that the JMR incurred additional costs for traffic control in 2008 as a result of events within HPS's control.  The fact HPS was not even working on the Project at this time render these claims dubious.

146.     JMR even admitted that all of the charges reflected in Backcharge No. 2 were not proximately caused by events within HPS's control.  At trial, Rivard testified that the USACE had approved certain change orders that included costs for traffic control, which Rivard estimated to be work about $10,000.  Rivard, Tr. 612-13.  JMR did not make any effort to exclude these costs from Backcharge No. 2.  Rivard, Tr. 636.

United States District Court
Northern District of California

147.    HPS has also demonstrated that JMR gave inadequate credit to HPS for paving work.  JMR deducted $8,658 as a credit "for the paving [JMR] would have incurred in 2008 for the laterals that would have gone in."  Rivard, Tr. 626; *see* Exh. 241.  Rivard admitted that this credit is based on the original design for the laterals, even though the laterals that were installed were actually "much longer."  Rivard, Tr. 633.  The evidence also shows that Rivard failed to provide any credit for the laterals installed at Alcosta, one of the three intersections.  *See* Exh. 241; Rivard, Tr. 632-33.

148.    The paving credit estimates that each square foot of paving is valued at $1.95, which includes the cost of labor, paving material and hard costs.  Rivard, Tr. 643-34; *see also* Exh. 241.  However, HPS presented evidence that when JMR submitted its charges to the USACE relating to an approved change order, which included costs for paving, JMR sought $11 per square foot.  *See* Exh. 496; Rivard, Tr. 636-37.  An $11 rate would increase the amount of HPS's credit from $8,658 to $48,840.  That amount does not account for the additional square footage that should have been included for the longer length of the laterals and the Alcosta intersection.

149.    Rivard explains that the price charged to the USACE was higher because change orders deal with a small area which must absorb the costs of mobilization and demobilization, and those costs are spread out in the initial bid.  *See* Rivard, Tr. 637.  Nevertheless, JMR has not presented any evidence substantiating its $1.95 figure, and the Court finds that amount discredited based upon the $11 price in the change order.

150.    There is also evidence that JMR failed to credit HPS for the permanent paving restoration JMR was required to do under the contract.  A representative from the City testified that in 2008, JMR did not complete its final paving restoration.  Shields, Tr. 265-67.  Regardless of any defects or delay that were the responsibility of HPS, JMR would have had to complete the final paving in these areas.  HPS explains:

> In 2008 JMR could not have performed final paving restoration or
> traffic control in connection with the remaining 300 feet of
> Bollinger Canyon road, the tie in East of Chanterella, the tie in at
> Iron horse Trail, the laterals at the three intersections, the air relief
> valves, or the 16 inch Pratt valves, because none of that work had
> been performed in 2008.

1  HPS Reply Br. at 17.

2       151.    HPS cites the Fifth Circuit's decision in *Pizani v. M/V Cotton Blossom*, 669 F.3d

3  1084, 1086-88 (1982), which the Ninth Circuit cited with approval in *Faria v. M/V Louise*, 945

4  F.2d 1142, 1144 (9th Cir. 1991).  In *Pizani*,

5              the plaintiff sued for damages that occurred when the defendant's
               ship collided with the plaintiff's dock.  The plaintiff's sole proof of
6              the amount of damages was a lump sum estimate, prepared by a
               construction firm, of the total cost for making a variety of repairs to
7              the dock…. The defendant argued that the estimate included costs
               for work unrelated to the damage caused by the defendant, and the
8              plaintiff offered no evidence showing how the estimate should be
               apportioned…. Nevertheless, the district court awarded the plaintiff
9              the full amount requested because the defendant had failed to show
               the amount of the claimed damages for which it was not liable.
10
               The Fifth Circuit reversed, holding that "[t]he plaintiff bears the
11             burden of proof to show the amount, as well as the fact, of
               damages.... [W]hen a defendant shows that the figure claimed by the
12             plaintiff includes non-compensable improvements, the plaintiff must
               prove ... the amount by which the original figure must be
13             decreased." …The court further held that the main error in the case
               arose "from the fact that the sole basis of Pizani's proof of the
14             amount of damages, the single lump-sum bid by [the construction
               firm], afforded no means whereby the district court could have
15             properly determined the actual amount of damages caused by the
               defendant."
16

17  *Faria*, 945 F.2d at 1144 (quoting *Pizani*, 669 F.3d at 1086-88).

18       152.    *Pizani* and *Faria* are relevant here.  HPS has shown that JMR's Backcharge No. 2

19  includes charges which were not proximately caused by events within HPS's control.  Therefore,

20  JMR bears the burden to prove the amount by which Backcharge No. 2 must be decreased.  *See id.*

21  JMR has not met this burden with respect to the period preceding HPS's testing of the Pipeline.

22  HPS began testing the Pipeline on September 11, 2009.  Irwin Expert Report, Exh. 623 at 28.

23  Accordingly, JMR is not entitled to any damages incurred prior to this date with one exception.

24  The $2,953.52 cost JMR incurred in November 2008 to fix trench plates installed by HPS is the

25  only charge in Backcharge No. 2 for which there is contemporaneous evidence showing why the

26  costs were incurred.  *See* Exh. 221.

27       153.    *Pizani* is distinguishable from this case because JMR has proffered more evidence

28  in support of Backcharge No. 2 than a mere lump-sum estimate of the total charges.  *See Pizani*,

United States District Court
Northern District of California

669 F.3d at 1086-88.  The Court has invoices, and may discern from the date of these invoices whether the charges were incurred when HPS was testing the Pipeline as a result of the leaks.  The damages in Backcharge No. 2 incurred after September 11, 2009 are equal to $202,167.72.  *See* Exhs. 222 ($890); Exh. 223 ($4,300.82); Exh. 224 ($3,369.48); Exh. 225 ($19,510.77); Exh. 226 ($300); Exh. 227 ($3,115); Exh. 229 ($4,596); Exh. 230 ($1,680); Exh. 231 ($7,607.18); Exh. 232 ($5,186.08); Exh. 233 ($57,526.39); Exh. 234 ($28,317.06); Exh. 235 ($9,600); Exh. 236 ($2,659.44); Exh. 237 ($5,602.50); Exh. 238 ($40,607); Exh. 239 ($1,960); Exh. 240 ($5,340).

154.    HPS has made a strong showing that JMR did not include an adequate credit for charges that JMR would have incurred regardless of HPS's conduct.  The Court will use the $11 per square foot cost that JMR sought from the USACE.  This equals $48,840.  Because Rivard testified that the size of the Alcosta intersection is similar to the other intersections, the Court will award an additional credit of 300 square feet.  Rivard, Tr. 632-33.  The Court also awards an additional credit of 400 square feet for the final paving.  *See* HPS Rebuttal at 17.  Finally, because JMR concedes it did not account for the full length of the laterals, the Court awards an additional credit of 300 feet.  These additional credits, which are charged at the $11 rate, bring the total credit to $59,840.

155.    Accordingly, the Court awards JMR damages for the costs JMR incurred in November 2008 while fixing trench plates installed by HPS ($2,953.52), plus additional costs JMR incurred after September 11, 2009 when HPS was the sole proximate cause of the damages ($202,167.72), less the charges that JMR would have incurred regardless of HPS's conduct ($59,840), for a total of $145,281.24.

## IV.    CONCLUSION

156.    Defendants JMR and GAIC are jointly and severally liable to HPS in the amount of $332,435.72.  GAIC is severally liable to HPS in the additional amount of $11,859, for a total amount of $344,294.72 against GAIC.

157.    JMR is entitled to recover $67,060.16 on Backcharge No. 1 and $145,281.24 on Backcharge No. 2, which together are equal to $212,341.40.  Defendants are entitled to offset the amount owed to HPS by the amount of JMR's counterclaim.

United States District Court
Northern District of California

1    158.    Accordingly, JMR and GAIC are jointly and severally liable in the amount of

2  **$120,094.32**, and GAIC is severally liable to HPS in the additional amount of **$11,859**.

3        **IT IS SO ORDERED.**

4  Dated: August 1, 2014

JOSEPH C. SPERO
United States Magistrate Judge