UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HPS MECHANICAL, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>JMR CONSTRUCTION CORP., et al.,<br><br>    Defendants. | Case No. 11-cv-02600-JCS<br><br>**ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT**<br><br>Re: Dkt. No. 160 |

## I.   INTRODUCTION

This is a contract dispute related to a construction project. The Court held a bench trial in February of 2014 and, after extensive post-trial briefing, issued its Findings of Fact and Conclusions of Law ("FFCL") on August 1, 2014. *HPS Mech., Inc. v. JMR Constr. Corp.*, No. 11-cv-02600-JCS, 2014 WL 3845176 (N.D. Cal. Aug. 1, 2014) (Dkt. 156). Judgment was entered for Plaintiff HPS Mechanical, Inc. ("HPS") against Defendants JMR Construction Corp. ("JMR") and Great American Insurance Company ("GAIC").[1] JMR now moves to alter or amend the judgment, or in the alternative to allow additional testimony, pursuant to Rules 59(a)(2), 59(e), and 60(b) of the Federal Rules of Civil Procedure (collectively, the "Motion"). *See generally* Mot. (Dkt. 160). For the reasons stated below, JMR's Motion is DENIED.[2]

## II.   BACKGROUND

This Order assumes the parties' familiarity with the facts of the case, which are set forth in detail in the FFCL. In brief, this case arises from a U.S. Army Corps of Engineers ("USACE") project to build a pumping station and pipeline in San Ramon, California (the "Project"). The

---

[1] This Order refers to Defendants collectively as "JMR" except where discussing GAIC's several liability.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

1  USACE contracted with JMR to complete the Project, and JMR subcontracted with HPS to
2  complete certain aspects of it (the "Subcontract"), including much of the work on the pipeline.
3  The Project faced numerous setbacks and delays, and ultimately finished years behind schedule.
4  At the conclusion of the Project, JMR entered negotiations with the USACE regarding a Request
5  for Equitable Adjustment ("REA") and was able to reach a settlement.

6  HPS filed this action against JMR to recover based on a number of proposed change orders
7  ("PCOs") that HPS had submitted for increased costs and expenses that HPS contended were
8  outside of its control. JMR filed a counterclaim for "backcharges"—costs and expenses that JMR
9  purportedly incurred due HPS's improper acts and omissions—and for compensation that JMR
10 claims it would have received from the USACE but for project delays attributable to HPS. The
11 Court held a bench trial on February 19, 20, 24, and 25, 2014, and issued its FFCL on August 1,
12 2014. The Court judged JMR and GAIC jointly and severally liable to HPS in the amount of
13 $120,094.32, and GAIC severally liable for $11,859.00. Dkt. 157.

14 JMR now moves the Court to amend its judgment or take additional testimony.
15 Specifically, JMR contends that (1) its two backcharges should have been awarded in full, rather
16 than reduced; (2) GAIC's liability to HPS should be reduced; and (3) JMR should recover from
17 HPS for the project delay.

### III. LEGAL STANDARD

Rule 59(e) provides that a party may file a "motion to alter or amend a judgment." Fed. R. Civ. P. 59(e). The Ninth Circuit has explained the standard for a motion under Rule 59(e) as follows:

> "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir.1999) (en banc) (per curiam) (internal quotation marks omitted). But amending a judgment after its entry remains "an extraordinary remedy which should be used sparingly." *Id.* (internal quotation marks omitted). In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law. *Id.*

2

*Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1112 (9th Cir. 2011). This Rule "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been made prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted). Defendants' Motion focuses on the first and third grounds for relief, arguing that amendment of the judgment is warranted to "correct manifest errors of law or fact upon which the judgment rests" and to "prevent manifest injustice." *See id.*; Mot. at 3.

The other Rules that JMR cites provide no broader basis for relief. "There are three grounds for granting new trials in court-tried actions under Rule 59(a)(2): (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence." *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir. 1978) (per curiam); *see also Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1174 (N.D. Cal. 2009). For the purpose of JMR's present arguments, this is equivalent to the standard for altering or amending judgment under Rule 59(e).

Rule 60(b) sets forth specific grounds for relief at subparts (1) through (5), none of which apply to this case. Subpart (b)(6) is a "so-called catch-all provision" that allows a court to set aside a judgment for "any other reason that justifies relief." *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008); Fed. R. Civ. P. 60(b)(6). That provision "is to be 'used sparingly as an equitable remedy to prevent manifest injustice and is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.'" *Id.* (quoting *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1103 (9th Cir. 2006)). It is a narrower avenue for relief than JMR's timely motion under Rule 59.

**IV.   ANALYSIS**

First, the Court denies JMR the relief requested here because the Motion is improper. Most of the arguments raised in the Motion could have been made at trial or in JMR's post-trial briefs. Post-judgment motions are not designed to save a party from its failure to present arguments or evidence at trial, where the evidence is available at the time of trial.

Second, as to the remaining arguments in the Motion that were made at trial or in post-trial briefing, the Court is satisfied that there was no manifest error of law or fact in its FFCL. In the sections that follow, the Court addresses each of JMR's arguments in turn.

### A. Backcharge No. 1

JMR filed a counterclaim against HPS for breach of contract, alleging that JMR was entitled to damages for aspects of the Subcontract that HPS failed to timely or adequately perform. Dkt. 13. Some of these damages are consolidated in Backcharge No. 1, a letter from JMR to HPS dated November 18, 2008. Ex. 200 at 0002.[3] The Court determined that JMR was entitled to these damages with three exceptions: a 12% markup for overhead and profit, a $1,143.20 charge for cleanup of an oil spill, and a $15,037.65 charge for asphalt overages. *See* FFCL ¶¶ 112−37.

#### 1. 12% Markup

In the FFCL, the Court concluded that "JMR ha[d] not proven entitlement to the 12% markup on Backcharge No. 1" that it claimed. FFCL ¶ 135. JMR's only support for the markup at trial was the testimony of Gareth Figgess, who served as a consultant to JMR on the Project and prepared Backcharge No. 1. Regarding an entry of $9,984 listed in a summary of Backcharge No. 1, Figgess testified: "I believe that was the markup stipulated in the subcontract agreement or changed work or back-charged work. I believe it was 12 percent, and that's why it's 12 percent here." Tr. 595:25−596:2.[4] The Court denied JMR's claim to this markup because JMR failed to cite any "contractual provision that entitled it to a 12% markup." FFCL ¶ 136.

JMR now points to section 10.1.1 of the Subcontract, which provides that if HPS fails to perform work required by the Subcontract, JMR can charge HPS for the cost of completing the work, "including reasonable overhead, profit, attorneys' fees, costs and expenses." Ex. 328 at 0023.[5] The parties refer to such charges as backcharges. JMR also points to section 8.7, which provides that if the scope of work under the subcontract changes, adjustments to HPS's compensation "shall be based on the net change in Subcontractor's reasonable cost of performing the changed Subcontract Work plus, in case of a net increase in cost, an agreed-upon sum for

---

[3] Citations to exhibits refer to the parties' trial exhibits.
[4] Transcript citations refer to the trial transcript, available at docket numbers 140 (vol. 1, pp. 1−207), 142 (vol. 2, pp. 208−420), 148 (vol. 3, pp. 421−622), and 149 (vol. 4, pp. 623−697).
[5] HPS argues that the applicable provision is actually section 10.1.2, which allows JMR to contract with other subcontractors to make up for work HPS failed to perform. That appears to be correct, but has no impact on the outcome. Section 10.1.2 allows JMR to "charge the cost to the Subcontractor as provided under Paragraph 10.1.1.1." As there is no such paragraph in the Subcontract, in context this appears to refer to section 10.1.1. The Court therefore finds no significant difference in the outcome whether the starting point is section 10.1.1 or 10.1.2.

4

1   overhead and profit not to exceed Twelve percent." *Id.* at 0022.  Reading these two provisions in
2   conjunction, JMR argues that it is entitled to a 12% markup of its backcharges, because "Section
3   8.7 of the Subcontract establishes 12% as the mark-up the parties agreed to for price adjustments
4   to the Subcontract."  Mot. at 5.

5   The Court finds no reason to alter its previous judgment.  Even setting aside that JMR
6   failed to refer to any contractual provision until its present motion, the provisions it now cites do
7   not support a 12% markup of the backcharge.  Section 8.7 specifically governs a change in
8   "Subcontractor's"—i.e., HPS's—costs, and only discusses a 12% overhead markup in the context
9   of an *increase* in those costs.  On its face, section 8.7 does not govern a scenario where JMR must
10  make up work that HPS failed to perform.  Section 10.1.1, which does govern such a scenario,
11  does not refer to section 8.7 in any way.[6]  Further, even if section 8.7 did apply, it provides only
12  for "an agreed-upon sum for overhead and profit *not to exceed* Twelve percent," not for an
13  automatic markup of 12%.  (Emphasis added.)  The Court also notes that JMR's letter to HPS
14  itemizing Backcharge No. 1 did not include a 12% markup.  Ex. 200 at 0002.

15  Under section 10.1.1 of the Subcontract, JMR is entitled to "reasonable overhead, profit,
16  attorneys' fees, costs and expenses" in making up for work that HPS failed to complete, but JMR
17  made no showing at trial as to what those "reasonable" amounts should be.  Moreover, it is not
18  clear from the Subcontract that JMR should recover its own markup where it has not performed
19  the remedial work but instead hired another subcontractor to do so and seeks to pass that
20  subcontractor's charge—which already includes the subcontractor's overhead and profit—on to
21  HPS.  *See* Ex. 328 at 0023 (§§ 10.1.1, 10.1.2).  JMR argues that HPS failed to object to the
22  markup, but it is JMR's burden to prove the damages it is entitled to, and it did not meet that
23  burden here.  *See* 9th Cir. Model Jury Instruction 5.1.  The judgment that JMR cannot recover this
24  markup therefore stands.

---

[6] Because each party's increased costs are governed by a different provision of the Subcontract, the Court is not convinced that the same standards apply to determining each party's reasonable overhead.  JMR's eleventh hour references to HPS's own overhead claims are therefore not persuasive in justifying JMR's 12% markup.  *See* Reply (Dkt. 162) at 3, 4−5.

### 2. Paving Overage of $15,037.65

JMR submitted evidence that HPS's grading in filling trenches was inconsistent and at times too low, thus requiring excess asphalt from Terra Construction, Inc. ("Terra"), another subcontractor, to pave over the trenches. FFCL ¶ 133. The Court concluded, however, that JMR failed to adequately establish the amount of its resulting damages. FFCL ¶¶ 133−34.

JMR points to page 0002 of Exhibit 209, which appears to be a screenshot or printout listing certain backcharges, including the paving overage, as "valid" and "strong," and others as "disputed." This exhibit has a cover sheet reading "BC-4: Letter from Kenny Pourroy to Les DenHerder agreeing to charges other than the disputed $13,949.99." Ex. 209 at 0001. JMR claims that this document is an admission by HPS that certain charges are valid. Mot. at 6. Whatever the second page is, it does not appear to be a letter, and the Court did not find the cover page sufficient to self-authenticate the document as an admission by HPS. FFCL ¶ 114. JMR does not dispute that the document was not discussed at trial. *See id.* The Court's conclusion stands that this document alone, without any testimony to establish its nature or origin, is not proof of an admission by HPS.

JMR also cites Figgess's testimony regarding the asphalt overage, and a document that appears to break down the amount of asphalt used through September 25, 2008. Although Figgess testified that paving "cost more money than it should have" due to the need for additional asphalt, Tr. 595:15−16, the documentation submitted to support this claim fell short of what JMR provided for its other claims of excess work required of Terra. For the other claims, JMR provided letters from Terra and invoices of charges on Terra letterhead. Ex. 205 at 0002−15. The Court relied on this evidence in awarding damages to JMR. FFCL ¶¶ 127−29 (citing Ex. 205). For the excess asphalt, however, JMR submitted only a worksheet summarizing "AC Paving Extra Costs," which does not include the Terra logo or otherwise indicate its origin, and does not explain how the quantity of asphalt used was determined. Ex. 206. JMR refers to this document in its Motion as "Terra's invoice," Mot. 7, but JMR did not establish at trial that the document originated from Terra, and the document does not resemble the other Terra invoices in evidence. *See* Exs. 205, 206. The Court finds no reason to alter its conclusion that JMR failed to meet its burden at trial to

prove that it was entitled to $15,037.65 for excess asphalt.

### 3. $1,147.20 Resulting From Oil Spill

JMR submitted evidence that the presence of an oil spill on the Project work site caused another subcontractor, Terra Construction, Inc. ("Terra") to accrue $1,147.20 in additional charges to JMR. Ex. 205 at 0006−07. The Court denied recovery for the oil spill because JMR submitted no evidence that HPS was responsible for the oil spill. FFCL ¶ 132.

JMR now argues that Exhibit 209 is an admission that the cost associated with the oil spill was a valid backcharge. As discussed above, the Court is unable to conclude that Exhibit 209 constitutes an admission.

JMR also points to a letter that JMR sent to HPS stating that "HPS and/or their subcontractor were the only ones working in the area" at the time of the spill, Ex. 215 at 0018, as well as to a log entry for the day of the spill that, while not mentioning the spill itself, indicates that the only work done that day was by employees of Terra, HPS, and Welco Engineering (HPS's subcontractor). Ex. 476 (entry for Aug. 15, 2008). This evidence is hardly conclusive. It is possible, for example, that the oil spill was caused by Terra, or that it flowed into the trench from outside of the worksite. Further, the Court advised the parties during trial that they must present and discuss the evidence on which they intended to rely. Tr. 269:23−270:4.[7] JMR failed to present testimony at trial showing that HPS was responsible for the spill. At the very least, JMR has not demonstrated a "manifest error[] of law or fact" that justifies amending the judgment. *See Allstate Ins. Co. v. Herron*, 634 F.3d at 1112. The Court's conclusion stands that JMR failed to carry its burden of proving that HPS caused the oil spill.

### B.  Backcharge No. 2

JMR also sought to recover a second set of damages categorized as Backcharge No. 2. As with Backcharge No. 1, the Court awarded JMR some but not all of the damages that JMR sought,

---

[7] In response to HPS's counsel's statement that he did not intend to "show the witnesses all of the communication that took place on pertinent issues," the Court stated that it would not "allow [the parties] to say: Oh, and by the way, buried in this exhibit, which we didn't bring up during the trial, are 400 communications which prove our point, [because] [t]he reason we have live witness[es] is to get this done." Tr. 269:25−270:4. The parties were therefore on notice that they must address relevant evidence during the trial.

7

and JMR now challenges the decision not to award these damages in full.

### 1. 12% Markup

JMR again claims that it is entitled to a 12% markup of its costs based on section 8.7 of the Subcontract. For the reasons discussed above, the Court's previous conclusion that JMR is not entitled to this markup stands.

### 2. Charges Incurred Before September 2009

The Court excluded all of JMR's charges predating the discovery of leaks in HPS's pipes in September 2009, based on the conclusion that JMR failed to prove that these earlier charges were caused by HPS. *See* FFCL ¶¶ 144, 155. Although the Court found HPS responsible for some of the delays during this period, *see id.* ¶¶ 38–39, JMR presented only conclusory testimony that the charges at issue were attributable to the delay, with no explanation as to why that was true.

Much of the testimony that JMR now cites in support of these claims states only that JMR did not include these costs in its original proposal, but does not explain why the costs resulted from HPS's delays. *See, e.g.*, Tr. 495:24–496:7 (John Morrill), 571:10–572:9 (Gareth Figgess), 627:6–15 (Ronald Rivard). The only real support comes from the conclusory testimony of Ronald Rivard, who testified that "all the costs associated with Back Charge No. 2 is [sic] related to all the work on behalf—that JMR did on behalf of HPS for support within the right-of-way, which would include the traffic control, the paving, any element that was related to that pipeline work." Tr. 606:16–20. In response to JMR's counsel's question as to whether "the $308,282 in costs reflected in Back Charge 2 [were] costs that JMR would not have incurred had the August 22nd deadline been met," Rivard stated, "That is correct." Tr. 612:9–12. And Rivard later testified that JMR "would not have incurred any of these costs" if HPS had met its initial deadline. Tr. 627:18. Repeating the same conclusory testimony does not make it more persuasive, and the Court found Rivard's testimony inadequate. *See* FFCL ¶ 142.

JMR's witnesses did not testify as to why these charges were the result of HPS's delay. Instead, JMR made arguments to that effect in its post-trial briefing and in its present Motion. *E.g.*, Mot. at 10 n.8. Counsel's arguments are not evidence. If JMR had produced testimony to explain the relationship of these charges to the delays, perhaps it could have recovered these

8

damages. Documentary evidence of the connection might also have been sufficient, although the Court instructed the parties that they should present relevant evidence at trial through their witnesses. *See* Tr. 269:25–270:4. But JMR cites neither testimony nor written evidence to support its counsel's explanation as to why the charges the Court excluded from Backcharge No. 2 were caused by HPS.

Rivard also acknowledged that Backcharge No. 2 failed to account for certain change orders that JMR successfully submitted to the USACE for compensation. Tr. 612:20–613:9; *see also* FFCL ¶ 146. Rivard was unable to state the value of these change orders, merely characterizing them as "relatively minor" and stating that it "might have been $10,000 worth." Tr. 613:8–9. Thus even if the Court were to accept JMR's arguments that HPS caused JMR's purported damages, it is not true—as JMR now argues—that "unrefuted testimony" showed that "JMR [was not] compensated by the [USACE] for these additional costs." Mot. at 9. Rather some amount *was* compensated, and JMR failed to account for that payment in the evidence that it submitted. *See* Tr. 636:12 (statement by Rivard that "[i]t's not in the documentation"). The value of any actual damages, even assuming causation, is therefore speculative.

The Court finds no manifest error in the conclusion that JMR failed to prove its entitlement to the excluded portion of Backcharge No. 2, and thus no basis to amend the judgment or allow additional testimony.

### 3. Paving Credit

JMR argues that HPS is not entitled to the $59,840 paving credit that the Court awarded. None of JMR's arguments on this point establish a manifest error sufficient to invoke Rules 59 or 60.

First, JMR argued that because "it is undisputed that the location of the laterals was changes from the intersection to a point of lesser depth, thereby saving HPS considerable money," HPS should not also be entitled to a paving credit. Mot. at 13. In making this argument, JMR does not attempt to quantify the savings that resulted from this decision, does not identify how such savings were allocated among the parties, and does not discuss what evidence was presented at trial to support offsetting any such savings against the paving credit. This argument is therefore

9

not sufficient to warrant amendment.

Second, JMR argues that the Court improperly found that JMR failed to account for paving at the Alcosta intersection. *Id.* According to JMR, Exhibit 241 mistakenly lists paving at Ironhorse Trail when the actual paving occurred at Alcosta, and thus that exhibit should be taken as evidence that JMR accounted for paving at Alcosta. JMR fails to explain why this unsupported assertion in its Motion is sufficient to materially change the meaning of a document in evidence. *See also* Tr. 632:16–23 (testimony by Rivard that the credit covered paving at the three intersections listed in Exhibit 241, including Ironhorse Trail but not Alcosta).

Next, JMR disputes the appropriate value per square foot of paving. JMR argues that the Court's figure of $11 per square foot was improper because it derived from a small paving job that lacked economies of scale, and that the Court should instead credit Rivard's testimony that the paving credit was worth only $1.95 per square foot. Mot. at 13−14 (citing Tr. 633−34). But Rivard only testified to the amount of the credit, with no explanation of the basis for that number. Tr. 633:25−634:2. With no testimony that any party ever actually paid or recovered $1.95 per square foot of paving, the Court is not inclined to alter its determination that the credit should be based on $11 per square foot. *See* FFCL ¶¶ 148−49 (citing Ex. 496; Tr. 636−37).

Finally, JMR states that "HPS should not have been given a credit for 400 square feet of final paving since HPS was not backcharged for the original scope of paving completed in 2008 and 2009." Mot. at 14. As JMR's Motion provides no further explanation and cites no evidence or testimony, the Court disregards this argument.

### C. PCO 53

The Court concluded in the FFCL that GAIC was liable for the full value ($11,859) of PCO 53 (Ex. 588) which covered HPS's work installing a test plate on a preexisting valve. FFCL ¶¶ 78−80. GAIC argues that this should be reduced to $4,553, reflecting the results of JMR's negotiations with the USACE. Mot. at 14−15. GAIC relies primarily on section 6.5.2 of the Subcontract, which binds JMR and HPS to "all decisions, findings or determinations" that are made by a "person so authorized in the Owner-Contract Agreement, or by an administrative agency or court of competent jurisdiction or by arbitration, whether or not Subcontractor is party

thereto." Ex. 328 at 0015−16.  The Court set forth in the FFCL its reasoning as to why this provision does not bind the parties to the outcome of settlement negotiations between JMR and the USACE.  FFCL at 22 n.2.  GAIC makes no new arguments as to why the Court should alter this conclusion.

GAIC also cites sections 8.5 and 8.6 of the Subcontract, which requires HPS to "maintain for the Contractor's review and approval an appropriately itemized and substantiated accounting of" the basis for its claims in a dispute.  Ex. 328 at 0021.  GAIC did not raise this argument at trial, and the Subcontract does not specify what documents are required to satisfy this provision. It may well be that the PCO itself is a sufficient itemization and the trial testimony of HPS's superintendent Mike Jones is sufficient substantiation.  GAIC has not established the sort of manifest injustice that would justify amending the judgment as to this aspect of damages.

### D. JMR's Delay Claim

JMR disputes the Court's conclusion that JMR was not entitled to recover on its delay claim.  The Court determined that JMR failed to establish damages under either a critical path method ("CPM")[8] or the *Eichleay* formula.[9]  JMR's arguments generally are not based on manifest errors of fact or law, and instead rest primarily on JMR's dissatisfaction with the weight given to its experts' opinions.  As such, they are efforts to "relitigate old matters" that provide no basis for relief under Rule 59.  *See Exxon Shipping*, 554 U.S. at 485 n.5.

Further, HPS submitted evidence, in the form of its expert Jack Irwin's report, that significant unexcused delays were caused by JMR.  For example, Irwin concluded that JMR's delays related to shoring and excavation exceeded the USACE's allowances and extensions by 160 days.  Ex. 623 at 13−14.  Irwin also testified at trial that there were "significant delays caused by . . . JMR on the project."  Tr. 380:17−20.  Irwin's conclusion that at least some delays were attributable to JMR's work related to shoring is supported by the USACE's records of its

---

[8] This method of project modeling—and by extension, delay analysis—is explained in the FFCL at paragraphs 85 through 93.
[9] This test takes its name from the Armed Services Board of Contract Appeals' decision in *Eichleay Corp.*, 60-2 B.C.A. (CCH) ¶ 2688 (1960), *aff'd on reconsideration*, 61-1 B.C.A. (CCH) ¶ 2894 (1961).

11

negotiations with JMR. As the Court observed in the FFCL, the USACE's records indicate that JMR conceded "that they had not met the specified shoring requirements of the contiguous pile system until the third or fourth submittal," and at the same meeting where JMR made that concession, "JMR agreed to reduce their request for extended delay from 459 days to 365 days." Ex. 539; FFCL ¶ 83. This is not to say that JMR had *no* evidence or testimony supporting its position, only that the Court's conclusion that JMR should not recover on its delay claim was supported by the record. JMR has made no showing of manifest error. The Court nevertheless briefly addresses JMR's specific arguments.

### 1. JMR's Settlement with the USACE

JMR argues that because the Subcontract makes HPS liable for damages caused by its performance, "[n]aturally, this would include the extended overhead the [USACE] did not compensate JMR for during REA negotiations." Mot. at 16. That conclusion is only "natural" if the USACE attributed its decision not to compensate JMR to HPS's delays. The USACE's records of the negotiations do not include any such indication, and instead suggest that the uncompensated delay related to JMR's shoring issues. *See generally* Ex. 539. The USACE representative who testified at trial did not recall the basis for uncompensated delays. Tr. 293:9–13, 296:1–15.

JMR argues that relief should be granted because its expert witness John Elmer was "not allowed to" testify about negotiations with the USACE for which he was present. Mot. at 16. The Court asked JMR's counsel to focus his questioning of Elmer on the actual cause of delay in completing the Project. Tr. 652:2–7. With no evidence in the USACE's records or testimony from its representative to establish that the USACE attributed the delay to HPS, Elmer's expert testimony regarding negotiations would not have been sufficient to support that conclusion.

### 2. CPM Analysis

In the FFCL, the Court concluded that the "CPM analysis that JMR presented . . . is not any more persuasive than HPS's." FFCL ¶ 99. The Court noted a number of deficiencies, including the cursory nature of Elmer's expert report, FFCL ¶¶ 99–100 (citing Ex. 244), the three tests that were not approved until March 9, 2010, *id.* ¶ 104, the combined test that was not carried

12

out until August 2, 2010, well after HPS completed its work, *id.* ¶ 104, and open questions as to whether HPS had exclusive control of the factors leading to delay and whether JMR gave HPS timely notice of the delay claim, *id.* ¶ 1105–06. JMR's Motion does not address these deficiencies in detail.

JMR argues that although its experts' reports and testimony do not clearly explain their CPM analysis, they were based on the same data as the more detailed reports JMR prepared during negotiations with the USACE (which attributed all critical path delay to the USACE). *See* Mot. at 18. That may be true, but the reports are not persuasive if they fail to provide sufficient detail to support their analysis. JMR attempts to explain the delays in approving and completing testing, *see id.* at 20, but fails to justify holding HPS responsible for the full period of delay between December 23, 2009 and May 26, 2010. Perhaps most significantly, JMR's Motion states that the contract specifications for testing the combined Project were not defined until June 2010—the month following HPS's completion of the pipeline. *Id.* at 20. There is no indication that HPS's testing of the pipeline needed to be completed before the contract specifications could be defined. It would seem that final joint testing could not be completed until those specifications were determined, and that the critical path therefore did not run through the pipeline, but rather through the meeting room, or perhaps through whatever undefined delays occurred between the decisions made in June and the tests performed in August.

### 3. *Eichleay* Analysis

The *Eichleay* test is used, essentially, to determine whether a contractor is entitled to recover damages for being forced to keep resources "on standby" during an indefinite delay in work. *See P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1371–73 (Fed. Cir. 2003). It is generally applied to cases where a government contractor seeks to recover against the government for project delays, and requires a court to evaluate the following questions to determine whether damages are available:

> (1) was there a government-caused delay that was not concurrent with another delay caused by some other source; (2) did the contractor demonstrate that it incurred additional overhead . . . ; (3) did the government CO issue a suspension or other order expressly putting the contractor on standby; (4) if not, can the contractor prove

13

> there was a delay of indefinite duration during which it could not bill substantial amounts of work on the contract *and* at the end of which it was required to be able to return to work on the contract at full speed and *immediately*; (5) can the government satisfy its burden of production showing that it was not impractical for the contractor to take on replacement work (*i.e.*, a new contract) and thereby mitigate its damages; and (6) if the government meets its burden of production, can the contractor satisfy its burden of persuasion that it was impractical for it to obtain sufficient replacement work. Only where the above exacting requirements can be satisfied will a contractor be entitled to *Eichleay* damages.

*Id.* at 1373. In this case, HPS (as the party from whom damages are sought) takes the place of the government in the analysis set forth above.

The first question is whether there was an "[HPS]-caused delay that was not concurrent with another delay caused by some other source." *Id.* As discussed above in the context of CPM analysis, JMR has failed to establish that the project delay it seeks to recover for was caused solely by HPS.

JMR also fails to adequately address the deficiencies noted in the FFCL. For example, in response to the Court's conclusion that JMR failed to show it was unable to work during the delay period, FFCL ¶ 108, JMR asserts that the evidence "showed that JMR was not working on the project for *much of* the period." Mot. at 21 (emphasis added). Even taking JMR at its word as to the evidence, this would not be a sufficient showing to recover damages for the whole period. The Court also concluded that JMR's expert's figure for cost of overhead per day was flawed because it was based on average field costs during the entire Project, not the specific period at issue, and the evidence showed that these costs varied across different segments of the Project. FFCL ¶ 110. If JMR's only remaining role was to perform ten days of combined testing, it is not plausible that JMR would need to keep the same resources "on standby" and incur the same costs as during more active phases of the Project. Accordingly, without a more tailored analysis of JMR's actual overhead costs, *Eichleay* damages are speculative at best.

### 4. Suspension of Work Clause

In *P.J. Dick*, the Federal Circuit ultimately determined that the contractor was not able to recover under the *Eichleay* test, but could recover under a suspension of work clause in its contract. *See id.* at 1375. JMR now argues that the present case warrants the same outcome based

14

on "a suspension of work clause . . . in JMR's Contract Specifications with the [USACE] under FAR 52.242–14." Mot. at 22 (citing Ex. 278 at 0100). This argument fails for a number of reasons.

First, JMR did not make this argument before filing its post-judgment Motion, which is too late to raise "arguments . . . that could have been made prior to the entry of judgment." *See Exxon Shipping*, 554 U.S. at 485 n.5. Second, it is not clear how a contract between JMR and the USACE, referencing a Federal Acquisition Regulation that permits contractors to adjust their compensation in the case of government-imposed delays, is enforceable against HPS for damages. Finally, even the regulation that JMR cites and the standard applied in *P.J. Dick* require a showing that the other party caused the project delay, and JMR has not made that showing here.

### 5. Length of Trial

JMR also suggests that it could have presented a more persuasive argument regarding its delay claim but for "the condensed trial time that was allowed." *Id.* at 22. At no point was the trial "condensed": JMR had notice no later than the May 8, 2012 Case Management and Pretrial Order, almost two years before trial, that the Court intended to hold a four-day trial. *See* Dkt. 36. JMR is not entitled to relief for its own failure to use its allotted time at trial effectively.

## V. CONCLUSION

Rules 59 and 60 provide mechanisms to correct errors of the court or account for exceptional circumstances, such as evidence not previously available. They do not grant a party dissatisfied with a judgment a second chance at its own missed opportunities or unsuccessful arguments. The trial has ended; these Rules do not serve to continue it indefinitely. The Court finds that JMR has failed to demonstrate that it is entitled to post-judgment relief. For the reasons discussed above, JMR's Motion to amend judgment or allow additional testimony is DENIED.

**IT IS SO ORDERED.**

Dated: October 17, 2014

JOSEPH C. SPERO
United States Magistrate Judge